## HENRY LEE *vs.* CHARLES K. KIRBY.

Inadequate consideration, or improvident formation of a contract, or decline in the value of its subject matter, is not, in general, in the absence of mistake, fraud or ambiguity reason for the refusal of a decree of specific performance.

The plaintiff and defendant in October 1865 made a written contract, by which the former agreed to sell a lot of land to the latter, and to advance to him, from time to time, sums of money for the purpose of building nine houses thereon, and the latter agreed to build the houses, and to pay for the land at the price of $3.40 per square foot, and repay the advances, on or before December 1, 1366, with interest at six per cent. on the price of the land from November 1, 1865, and on the advances from the time they should be made. The price of the land was in fact arrived at in the negotiations which preceded the con-tract, by taking the land at $2.50 per square foot, adding thereto a year's interest at four per cent. on that amount, six months' interest at four per cent. on the amount of the advances, and a bonus, besides a commission of two per cent. on both the price with these additions and the amount of the advances. Soon after this agreement, on the de-fendant's request for an extension of the time for building three of the houses, the plain-tiff wrote to him, " Our agreement was on the basis of one year's interest upon the cost of the land, and average six months' interest on the advance; if you should desire an extension of a third of the cost of the land and one third of the whole advance, I shall be prepared to agree to it on the basis of our contract." The defendant replied, " Yours is before me, in which you give the basis of our agreement, and say you will be prepared to extend the time on one third of the cost of the land, and one third of the whole cash advance, upon the basis of our contract; all which I agree to." The defendant built five of the houses, paid for the land under them, and repaid the advances on them, according to the contract, but declined to build the other four houses. On a bill in equity to compel him to specifically perform the contract, the answer set forth the manner in which the price had been arrived at, and alleged that the contract had been modified by the subse-quent correspondence, and that its enforcement against the defendant would be harsh and inequitable. *Held*, that the plaintiff was entitled to a decree for specific performance.

BILL IN EQUITY filed April 6, 1868. The bill alleged that the plaintiff, being the owner of a tract of land containing 17,920 square feet, on Marlborough Street in Boston, did, on October 14, 1865, enter into an agreement, under seal, with the defend-ant, by which the defendant agreed to buy and the plaintiff to sell the said tract of land on the following terms: " The price of said land to be $60,928, with interest at six per cent. per annum from November 1, 1865, to the delivery of the deed ; the deed to be delivered on December 1, 1866, or as much earlier as said Kirby will pay the price of said land and repay the advances made by said Lee as hereinafter provided ; or said Kirby is to receive a deed of any one or more of the nine lots into which said land is to be divided, on paying said Lee the proportionate

price therefor, and repaying said Lee the advances made by him on the lots so deeded;" "said Kirby agrees to build on said land, with reasonable despatch, and at his own cost, nine brick dwelling-houses" of certain specified dimensions and materials, "each house, exclusive of the land, to cost $15,000, the first three houses to be finished ready for plastering the coming winter, if the weather will permit, the others to progress as rapidly as the weather will permit, and all to be ready for occupancy on December 1, 1866;" "said Lee agrees to make advances to said Kirby on said houses as they progress, at the times and in the proportions set forth" in a certain schedule "to the amount of $10,000 on each house, being $90,000 in all, on which advances said Kirby is to pay interest at the rate of six per cent. per annum until the sale and transfer of said houses to said Kirby is completed; said Kirby agrees to keep said land and houses free from all liens or mortgages made or suffered by him, and to pay to said Lee said purchase money for said land with interest and all moneys paid and advanced by said Lee under this contract, on or before December 1, 1866; in case there be any neglect or delay on the part of said Kirby to build and complete said houses, then said Lee may furnish the materials, and employ other person or persons to build and complete said houses, and charge the cost thereof to said Kirby, with interest; and if the purchase money, and all advances made by said Lee, are not paid to him by said Kirby on or before December 1, 1866, then said Lee may sell said land and houses; and, after deducting from the proceeds of the sale the amount due him, he is to pay the balance to said Kirby or his legal representatives."

The bill further alleged that the plaintiff on December 1, 1865, at the request of Kirby, consented to extend the time for building three of the houses, and for paying the price of the land to be covered by the same, for a reasonable time after December 1, 1866, the time for making the advances by the plaintiff upon the three houses to be proportionately extended; that the defendant had built five of the houses, had received deeds of them, had paid a proportionate part of the purchase money and repaid

the plaintiff's advances; that the plaintiff was ready to fulfil his part of the contract, and to make the advances agreed upon, if the defendant would go on and build the remaining four houses, or he was ready to convey the land, without its being built upon, "at the agreed price of $3.40 a foot;" but that the defendant refused either to build or to purchase the land at said price. The prayer was that the defendant might be decreed specifically to perform his agreement.

The answer admitted the making of the contract and the building and purchase of the five houses; denied that the contract required that the defendant should at all events build upon the land; alleged that a long time had elapsed since the time when, if at all, the contract was to be performed; that the circumstances under which it had been made were materially changed; that the cost of materials and price of labor had both advanced, and were at least twenty per cent. higher than they were at said time; and "that it would now be inequitable and a hardship for the defendant to be required specifically to perform said contract;" "that the agreed price for the land was $44,800, being at the rate of $2.50 per foot; that he was to pay one year's interest thereon, at the rate of ten per cent. per annum; that the plaintiff was to make advances as the building of the houses progressed, not to exceed in all the sum of $90,000; that the defendant was to pay six months' interest on the said sum of $90,000 at the rate of ten per cent. per annum, and to pay a further sum of $9900 as a bonus, being at the rate of $1100 per house; that when said agreement was reduced to writing, there was added to said sum of $44,800 a sum equal to four per cent. interest thereon for one year, said sum being the excess of one year's interest thereon at ten per cent., over the interest thereon for one year at six per cent.; that there was further added four per cent. interest for six months on said sum of $90,000, being the excess of ten per cent. interest thereon over the interest thereon for said time at the then legal rate, and also said sum of $9900, agreed to be paid as a bonus; that thereby said sum of $44,800 was increased to $58,292; that to avoid fractions this sum was reduced to $58,240, being at the rate of $3.25 per foot; that upon this last mentioned

sum and the amount of said advances, namely, $90,000, the defendant was to pay the plaintiff a commission of two per cent. per annum for one year, which was added to the price of the land increased as aforesaid; that with said aforementioned several additions the agreed price of said land was increased to $61,204.80; that the fraction of a cent in the value per foot of said land, as determined from this sum, was rejected, and said sum was thereby reduced to $60,928, the price mentioned in said agreement, and being at the rate of $3.40 per square foot; that said last mentioned sum of $60,928, or the proportionate part thereof for the several lots into which said land was to be divided, was to be paid only in case said houses were built and the plaintiff made said advances; and that, in the event of said houses not being built, and the plaintiff not being called upon to make said advances, the defendant was to have said land at the abovementioned rate of $2.50 per square foot."

The answer further alleged that " said agreement was hard and unconscionable, and the defendant ought not to be required specifically to perform the same; that he lost large sums of money in the erection of the five houses built as aforesaid; that in June 1866 it was understood and agreed between him and Lee, that the contract was to be dropped, so far as related to the building of the houses by him, and the making of said advances by the plaintiff, after the completion of the beforementioned five houses, and that the defendant was to have said land at the beforementioned rate of $2.50 per square foot;" and that, at the time of the extension of the agreement, (which the defend ant admitted,) on December 1, 1865, " it was still understood that in the event of said houses not being built the defendant was to have the land at $2.50 per foot."

The case was referred to a commissioner to take and report the evidence, and was reserved by *Morton*, J., on the bill, answer and commissioner's report, for the determination of the full court, before whom it was argued in November 1869. The facts are stated in the opinion.

*E. D. Sohier & F. V. Balch*, for the plaintiff.

*G. O. Shattuck & J. B. Thayer*, for the defendant.

AMES, J. The original contract appears to have been free from all ambiguity. There is no suggestion of any omission, mistake or fraud. It is not claimed that it was not fair and just in all its parts, or that it was harsh or unreasonable, or that it was attended at the outset with any circumstances that would be likely to prevent the court, in the exercise of its discretion, from ordering its specific performance on the application of either party. It was in view of certain mutual advantages that the price of the land was agreed upon; and so far as the original contract is concerned, it does not appear to be necessary or expedient to inquire by what computation, or in what precise mode, the parties arrived at the sum of $3.40 per square foot as the price. They manifestly expected that all the dwelling-houses would be completed in a little over one year from the date of the contract; and they were looking to the sale of the lots and houses as the source from which the defendant would derive his profits and the funds with which he was to repay the plaintiff's advances. There is nothing in the contract that imports that the defendant was at liberty to build or not as he should elect, or that he was to take the land at one price if he should build, and at a different and lower price if he should not. His promise to build on each of the nine lots, according to the prescribed model, was unconditional, and he reserved no right to recede or stop short if the enterprise seemed likely to prove unprofitable. The provision that, if he should not complete the houses, the plaintiff might do so, and charge the expenses to the defendant, is a cumulative remedy only, and does not confine the plaintiff to that mode of enforcing the contract. *Dooley* v. *Watson*, 1 Gray, 414. *Hooker* v. *Pynchon*, 8 Gray, 550.

The defendant however insists that the case does not stand upon the original contract, but upon a subsequent agreement by which it was waived or greatly modified. It became convenient to him, soon after the date of the contract, and after he had begun to prepare the foundations for six of the houses, to postpone operations upon the remaining three, and the evidence shows that he made a proposition to that effect to the plaintiff. The defendant insists that the effect of the written correspond-

ence, which thereupon took place between them, was wholly to abrogate the written contract to that extent, and remit the parties to a previously made oral agreement.

The plaintiff writes to this effect: " Our agreement was on the basis of one year's interest upon the cost of the land you purchased of me, and average six months' interest on the advance (that is, that the interest should not amount to more than six months on the whole advance). If you should desire an extension of a third of the cost of the land, and one third of the whole advance, I shall be prepared to agree to it on the basis of our contract." To this the defendant replies: " Yours is before me, in which you give the basis of our agreement, and say you will be prepared to extend the time on one third of the cost of the land, and one third of the whole cash advance, upon the basis of our contract; all which I agree to."

There must of course have been some preliminary negotiation, and it is admitted that the price at which the land was to be sold was arrived at in the manner indicated in the defendant's answer. But we do not find that there was any oral contract or independent agreement previous to the written contract, or that the case differs in any material particular from the common case in which parties, after arranging orally the terms upon which they are willing to agree, finally reduce their contract to writing for the purpose of showing the precise result of their negotiations, and excluding all preliminary offers and propositions. The subject of the correspondence was the extension of the time as to three of the houses, and upon that the plaintiff says, " If you should desire an extension," &c., " I shall be prepared to agree to it." There is nothing in either of the letters that implies that the houses were not to be built, and the advances not to be made. On the contrary, the extension was to apply as much to the advances as to the price of the land, which shows that the expectation was that all the houses would be built, though not at so early a period as was at first contemplated. There is no indication that, at that early period after the date of the contract, anything had happened to impair the prospect of a successful speculation, or that the defendant had changed

his mind as to going on with it. It appears to us therefore that the correspondence above mentioned does not amount to a waiver of the original contract, but to a notification from the plaintiff that if a partial extension of time should be desired he would be prepared to agree to it upon the " basis " (which may mean, upon the general rule or principle) of the existing contract. No specific time or period of extension having been spoken of on either side, nothing can fairly be inferred from the letters except that a postponement as to three of the lots, for a reasonable time, would be assented to by the plaintiff if desired by the other party.

It must be admitted that the parties have expressed themselves in such a manner in those letters, that their meaning is somewhat obscure. The plaintiff does not say how long an extension he would agree to, nor the defendant how long an extension he should desire. Each party speaks of the " basis of our agreement," and the " basis of our contract," in such a manner as to raise the question whether they intend to make a distinction between " agreement " and " contract," meaning by the former expression the preliminary negotiations by which the price of the land was determined, and by the latter the final contract as reduced to writing. Neither is it entirely clear what they mean by the cost of the land, or whether that word means the " cash price," or the price if sold on credit and coupled with an obligation to advance money for building purposes. It is also difficult to say whether, when they speak of the " basis of our contract," or agreement, they mean anything more than if they had said " one part of the agreement," or " one important element of the agreement." But if it was the intention of the parties in those letters to reduce the price of the land to $2.50 per square foot, and to give to the defendant the option to buy three of the lots at that price, without building the three remaining houses, or to take them at the agreed higher price if he should decide to build the houses and so to require the advances, we can only say that they have wholly failed to express any such intention. It is difficult to believe that so great a change in a written agreement, carefully drawn up in due form

of law, and recently signed and sealed by the parties, would be made in so loose, careless and uncertain a manner. We can put no such interpretation upon the letters without doing violence to the terms in which the parties express themselves.

The defendant, however, insists in his answer that in June 1866 a new agreement was made between the parties, to the effect that the original contract " was to be dropped," so far as related to the building of the remaining houses after the completion of the five; that no further advances should be required of the plaintiff; and that the price of the land should be reduced, as to the four remaining lots, to $2.50 per square foot. But we do not find, in the report of the evidence, any proof of this alleged new agreement. It is true that it appears that the defendant had found the enterprise, as far as he had gone with it, a losing one; that he reported to the plaintiff his unwillingness to carry it through as he had originally intended, and was told that he must act upon his own judgment. The plaintiff appears to have said that he should be glad to be relieved of the obligation to make any further advances; but we do not find it proved that he assented to a reduction of the price of the remaining lots of land, if the houses were not built. On the contrary, the price was charged at $3.40 per square foot, in the accounts rendered by the plaintiff on the first day of December in each of the years 1866 and 1867, and it does not appear that the defendant expressed any surprise or made any objection, on receiving those accounts.

Another ground of objection on the part of the defendant is, that, as matters now stand, the contract is hard, unequal and oppressive, and that its literal enforcement against him would operate in a manner different from that which was in the contemplation of the parties when it was executed. In an application to a court of equity for a specific performance, a decree for such performance, on proof of the agreement, is not a matter of strict right, but is discretionary with the court, in view of all the circumstances. *Western Railroad Co.* v. *Babcock,* 6 Met. 346, 352. 1 Story Eq. § 742, and cases cited. It will not be directed, if it should be, under the circumstances, unreasonable to do so.

*Wedgwood* v. *Adams*, 6 Beav. 600. This unreasonableness does not admit of being settled by any general definition, but must depend upon the circumstances of the case. *King* v. *Hamilton*, 4 Pet. 310. We do not understand the defendant in the case before us to charge that there has been either fraud, surprise or mistake. As to the alleged hardships of the case, the general rule is, that inadequacy of consideration, exorbitance of price or improvidence in the contract, in the absence of fraud, ambiguity or mistake, will not constitute a defence. " A court of equity does not affect to weigh the actual value nor to insist upon the equivalent, in contracts, when each party has equal competence." Hart, Chancellor, in *Sullivan* v. *Jacob*, 1 Molloy, 472, 477. To invalidate a contract on the ground of hardship, the inadequacy of consideration or exorbitance of price must be so gross as to shock the conscience, and the proof of it so great as to lead to a reasonable conclusion of fraud or mistake. *Coles* v. *Trecothick*, 9 Ves. 234. *Osgood* v. *Franklin*, 2 Johns. Ch. 1, 24. In the language of Chief Justice Shaw, 6 Met. 358, we must say that " we can perceive no such proof, nor anything approaching to it." The question of the want of equality and fairness, and of the hardship of the contract, should, as a general rule, be judged of in relation to the time of the contract, and not by subsequent events. We do not intend to say that the court will never pay any attention to hardships produced by a change of circumstances, but certainly the general rule is that a mere decline in value since the date of the contract is not to be regarded by the court in cases of this nature. *Low* v. *Tread well*, 3 Fairf. 441. *Coles* v. *Trecothick*, 9 Ves. 234. *Revell* v. *Hussey*, 2 Ball & Beat. 287.

But the hardship upon which the defendant mainly relies depends in a great degree upon the manner in which the agreed price of $3.40 per square foot was made up. He contends that somewhat more than one fourth part of that price was intended expressly as a compensation to the plaintiff for the inconvenience and trouble of raising and advancing a large sum of money on each lot; that in fact it was a commission upon a loan, and was incorporated into the price to disguise a charge which

otherwise would have been usurious; that, as events have taken such a course that no advance is now required, there is a failure of consideration as to that portion of the agreed price. He insists that he was really to pay a large bonus for a loan of money; and as he does not borrow the money, and gave seasonable notice that he should not borrow it, that it would be inequitable to compel him to pay the bonus, under whatever disguise it may be presented; and that a literal fulfilment of the contract would compel him to pay the plaintiff for sacrifices which he has never made, and inconveniences which he has never incurred. But it does not appear that the plaintiff has ever consented to any modification of the contract in this respect, or asked to be relieved of any part of the obligations which he thereby assumed. For the sake of selling his land at the contract price, he was willing to enter into the stipulations as to the proposed loan. For the sake of securing the proposed loan, the defendant was willing to buy at that price. The only question for the defendant was whether he would undertake to buy at that price, and on those terms. Upon that point he made his election. Can he now force the plaintiff to consent to abandon the contract, or reduce the price to $2.50 per square foot, by offering to renounce what the plaintiff conceded for the sake of obtaining the price stipulated in the contract, which concession he still offers and claims to carry out? We do not see why the plaintiff has not, at this moment, a perfect right under the contract to proceed to build the four remaining houses himself, at the expense of the defendant, and to sell them on his account, charging him with the loss if they should sell for less than cost, including the agreed price of the land as a part of that cost.

The defendant's answer does not specifically charge usury as a ground of defence, but we have no doubt that usury may very properly be taken into consideration by the court, under an answer that insists upon the objection that the contract is hard, unconscionable and oppressive. It will hardly be contended, however, that there was not an actual sale of the land contemplated by the parties. It was not a mere cover for usury, like the case in which a loan is made wholly or in part, in goods at ex-

orbitant prices. The price at which the defendant undertook to buy was a distinct and definite sum of money. *Beete* v. *Bidgood*, 7 B. & C. 453. There was no misrepresentation or fraud, no abuse of advantages, and no inequality of position of which he can complain. It can hardly be said upon the evidence that the price was exorbitant, and as it was at the time satisfactory to the defendant, it can hardly be material how it was made up. If there was an independent or collateral agreement to the effect that the defendant might buy for cash at a lower price, and if that collateral agreement was intentionally omitted from the written contract, and left as a matter of honorary obligation merely, it would not present a case of mistake, fraud or surprise upon which the court would refuse a decree of specific performance. *Irnham* v. *Child*, 1 Bro. Ch. 92, was a case in which a right to redeem was omitted from a written contract to convey, and left to an honorary understanding, in order to avoid the objection of usury. Lord Thurlow held that it was no bar to a decree for the specific performance of the written contract. 1 Sugden on Vendors, (7th Am. ed.) 181. 1 Story Eq. § 750, and cases cited.

In view of all the facts, we cannot say that the contract presents any features of ambiguity, surprise, mistake, omission, usury or hardship that should deprive the plaintiff of his equitable remedy. It is his duty to fulfil all its stipulations on his own part; and his right on those terms to insist that the defendant shall do all that he undertook to do on his part.

*Decree for the plaintiff, with costs.*