DAVID W. NORMANDIN & others[1] vs. EASTLAND PARTNERS, INC., & others.[2]

No. 05-P-910.

Worcester. March 16, 2006. - March 6, 2007.

Present: PERRETTA, BROWN, & KAFKER, JJ.

*Real Property,* Purchase and sale agreement, Bona fide purchaser, Specific performance. *Bona Fide Purchaser. Agency,* What constitutes. *Contract,* Sale of real estate, Third party beneficiary, Waiver, Specific performance, Impossibility of performance, Damages. *Damages,* Breach of contract.

In a civil action seeking specific performance of the codefendant's agreements to swap certain land with the plaintiffs, as well as that codefendant's agreement to convey the same property to a defendant, the judge properly concluded that the defendant had no obligation to honor the codefendant's agreements with the plaintiffs, where the plaintiffs had no reasonable expectation of proving that the defendant took the property subject to the plaintiffs' rights [383-384], or that the codefendant had actual or apparent authority to bind the defendant to the terms of the land swap agreements [384-386]; further, the plaintiffs' arguments that they were intended third party beneficiaries of the purchase and sale agreement between the defendant and the codefendant [386-387] and that the defendant waived any objections to the timeliness of the land swap agreements [387-388] did not rise to the level of acceptable appellate argument.

In a civil action seeking specific performance of the codefendant's agreements to swap certain land with the plaintiffs, as well as that codefendant's agreement to convey the same property to a defendant, the judge did not err in requiring the codefendant to attempt to repurchase the lots conveyed to the defendant and then convey them to the plaintiffs, or to provide the plaintiffs with funds to repurchase the lots from the defendant, where the codefendant's obligation to convey the lots to the plaintiffs did not require performance of a task that the codefendant was literally incapable of rendering, as the obligation was conditioned upon the codefendant's ability to obtain the lots from the defendant [388-391]; further, the remedy did not constitute an impermissible revision of the land swap agreements, but merely altered the manner by which the codefendant was to perform its contractual obligation [391], nor was the remedy unduly burdensome where the increase in the value of the land was not due to the codefendant's efforts or occasioned by

[1]Cynthia B. Normandin, Roy A. Nutting, and Merilyn R. Nutting.
[2]Greene-Mill Properties, Inc., and Hopedale Development, Inc.

extraordinary or unforeseen circumstances [391-392]; however, this court concluded that the portion of the judgment requiring that the plaintiffs receive the "benefit of their bargain" if an exchange could not be brought about should be reduced by the amount the plaintiffs were to pay for the lots as measured by the fair market value of the properties they were to convey to the defendant under the land swap agreements [392-395].

CIVIL ACTION commenced in the Superior Court Department on January 19, 2000.

The case was heard by *Francis R. Fecteau,* J., on motions for summary judgment.

*Christopher A. Kenney* for Hopedale Development, Inc.

*Evan T. Lawson (Marissa A. Goldberg* with him) for the plaintiffs.

*F. Alex Parra* for Eastland Partners, Inc., & another.

PERRETTA, J. These cross appeals by the plaintiffs and Hopedale Development, Inc. (Hopedale), involve land swap agreements between the plaintiffs and Hopedale as well as Hopedale's contract to convey the same land to Eastland Partners, Inc. (Eastland). On the plaintiffs' complaint for specific performance, the judge concluded that Eastland had no obligation to honor Hopedale's land swap agreements with the plaintiffs and ordered Hopedale to attempt to buy back the land from Eastland and perform its agreements with the plaintiffs or pay them damages in an amount that would either enable them to buy the land from Eastland or compensate them for its breach of their land swap agreements. We reverse that portion of the judgment pertaining to the amount of money damages potentially due the plaintiffs and remand the matter for recalculation of the amount of any such payment.

1. *The facts.* We summarize the facts relevant to these cross appeals as they are set out in the judge's memorandum of decision and order on cross motions for summary judgment, dated September 16, 2002, and his findings of fact and rulings of law of March 11, 2005, made in explanation of his order for judgment, as supplemented by undisputed facts contained in the record before us. In 1982, the Normandins and the Nuttings (the plaintiffs) purchased residential properties located at 61 and 65

Mill Street, respectively, from the defendant Hopedale. Their lots are configured in a "pork chop" shape, each with an impassable narrow and elongated strip of land at its easterly end, the terminus of which provide the lots with the requisite frontage on a public way sufficient to comply with zoning requirements. Access from their respective properties to a public road was by way of a deeded easement from Hopedale over its property.

In 1996, the plaintiffs learned that Hopedale had filed a plan seeking to subdivide the land directly adjacent to theirs, including the land that contained the easement. The easement would extinguish when the subdivision was built.[3] As laid out on the proposed subdivision plan, the border of the plaintiffs' land was separated from a proposed roadway by a strip of land, about three feet in width, effectively extinguishing their access to their property.

At some time during the pendency of the proceedings before the planning board for the town of Hopedale, the plaintiffs discussed with Hopedale the possibility of a land swap: the plaintiffs would convey the easterly portions of their properties to Hopedale in exchange for two of the subdivision lots, the Nuttings receiving lot 46 and the Normandins lot 50. The judge described this contemplated exchange as providing the plaintiffs with a more desirable lot configuration and "actual, more proximate, practical and convenient access to the proposed subdivision road," and Hopedale with the opportunity to recon-figure the subdivision to create additional building lots.

Hopedale's subdivision plan was approved on May 7, 1997. A little over six months later, on November 17, 1997, Hopedale and Eastland entered into a purchase and sale agreement for 141 of the subdivision lots for $2,000,000. Lots 46 and 50 were among the lots committed for sale. Paragraph 32B of the purchase and sale agreement reads:

> "[Hopedale] has negotiated with Nutting [and] Normandin
> . . . for exchanges of land, and if those exchanges of land
> are consummated, the net result will be additional build-

---

[3]These facts were known to all parties at the time the plaintiffs took their property.

able lots on the existing subdivision roads. None of those transactions can be consummated, however, until post-closing because each requires the conveyance of lots on the subdivision plan, and cannot be done until the covenant is released.[4] [Hopedale] will endeavor to enter into Purchase and Sale Agreements with Nutting [and] Normandin . . . prior to January 30, 1998, which agreements must be approved by [Eastland] (and approval shall not be unreasonably withheld or delayed) . . . . At the time of the closing, these agreements will be assigned to [Eastland], . . . and [Eastland] . . . [will agree] to abide by the terms thereof. Upon the consummation of each such transaction, [Eastland] shall pay [Hopedale] $14,285.00 for each additional net buildable lot. . . . *The provisions of this paragraph shall be limited to Purchase and Sale Agreements entered into prior to January 30, 1998.*" (Emphasis supplied).

The closing date was set for January 30, 1998.

Although the purchase and sale agreement was amended in writing several times for purposes, inter alia, of extending the closing date and increasing the purchase price, none of the amendments referred to the land swap agreements or otherwise purported to amend paragraph 32B. Rather, all amendments "ratified and confirmed" all the provisions of the agreement not expressly dealt with in the amendments. After signing the purchase and sale agreement, discussions concerning the land swap continued between Hopedale and Eastland. Eastland was not without reservations about Hopedale's proposed exchange and had concerns about whether the newly created lots would be buildable.

On April 1, 1998, Hopedale formalized its understanding with the plaintiffs and entered into land swap agreements with

---

[4]This reference to a "covenant" presumably refers to G. L. c. 41, § 81U, as amended by St. 1981, c. 421, § 1, which states in pertinent part that "[b]efore endorsement of its approval of a [subdivision] plan, a planning board shall require that the construction of ways and the installation of municipal services be secured" by any one, or a combination, of methods enumerated in the statute, including "(3) [b]y a covenant, executed and duly recorded by the owner of record, running with the land, whereby such ways and services shall be provided to serve any lot before such lot may be built upon or conveyed, other than by mortgage deed . . . ."

them. It did so without informing them of its pending sale to Eastland. Pursuant to the land swap agreements, Hopedale was to convey lots 46 and 50 to the Nuttings and Normandins, respectively, in exchange for easterly portions of their properties identified on a plan attached to each agreement and hereinafter referred to as the "Mill Street properties." The agreements provided that Hopedale would not convey title to the lots to the plaintiffs until "the Planning Board Covenant is released," see note 4, *supra*, which, in turn, was not to occur before there was substantial completion of the road abutting lots 46 and 50. The plaintiffs were to be notified by certified letter that the covenant had been released with the transfer of title to lots 46 and 50 occurring ten business days after the date of the letter.

Hopedale's attorney forwarded copies of the agreements to Eastland under a cover letter dated April 10, 1998. Counsel for Eastland replied that she would forward the agreements to Eastland and also advised Hopedale's attorney of her understanding that "any agreements with [the plaintiffs] needed to be entered into on or before January 30, 1998," the closing date originally set out in the purchase and sale agreement between Hopedale and Eastland.

At the closing with Hopedale on June 1, 1998, Eastland took the position that it was not bound by Hopedale's agreement with the plaintiffs but agreed to "attempt in good faith to work something out" with them. However, neither Hopedale nor Eastland informed the plaintiffs of Hopedale's conveyance to Eastland. Rather, the plaintiffs apparently learned of the conveyance in late 1999, when Eastland began clearing the land in the vicinity of their properties. Eastland refused to perform any land swap with the plaintiffs pursuant to their agreements with Hopedale and, instead, attempted to negotiate different agreements with the plaintiffs. As best we can tell, it no longer appears possible to reconfigure the subdivision lots in the manner contemplated by Hopedale for the reason that Eastland has conveyed some of the lots that were to have been involved in the land swap.[5]

On January 19, 2000, the plaintiffs brought the present action

[5] An officer of Eastland testified at his deposition that the exchange

against Hopedale and Eastland, alleging that Hopedale was in breach of the land swap agreements and that Eastland was obligated to carry out the exchange negotiated by Hopedale.[6]

2. *The Superior Court proceedings.* Acting on the parties' cross motions for summary judgment, the judge concluded that Hopedale was in breach of the land swap agreements and that Eastland had no obligation to carry out the exchanges contemplated under those agreements. The issue of damages for Hopedale's breach of contract was tried on November 19, 2004, and a final judgment was entered on March 17, 2005.

As provided in paragraphs four, five, and six of the final judgment, Hopedale is to attempt to repurchase lots 46 and 50 from Eastland and, if successful, convey them to the plaintiffs, who are then to convey to Hopedale those portions of the Mill Street properties as set out in the land swap agreements. In the event Eastland or the current owner or owners of the subdivision lots in question will not sell the lots to Hopedale or demand a price above market value, Hopedale is then to pay $150,000 to the Normandins and $150,000 to the Nuttings so that they themselves might attempt to purchase the lots.[7] Should the plaintiffs be able to acquire the lots from the current owner, they must then convey those portions of their Mill Street properties to Hopedale in accordance with the land swap agreements. There is, however, nothing in the judgment which provides for an adjustment in the damage award for the value of that portion

contemplated by Hopedale and the plaintiffs had become impossible because homes had been built on at least some of the lots that were to have been involved in the reconfiguration of the subdivision plan.

[6]The plaintiffs' complaint set out one count of breach of contract against Hopedale and three counts of breach of contract against Eastland as well as counts against it for trespass and violation of G. L. c. 242, § 7, negligence, and a request for a declaratory judgment establishing the existence of an easement benefitting their properties. The plaintiffs' negligence claim against Eastland was dismissed by stipulation of the parties, who also stipulated to the entry of a judgment establishing an easement.

[7]On November 19, 2004, after the partial grant of summary judgment, the judge conducted a bench trial on the question of damages. Based on the evidence presented, the judge found that during the time period between the formation of the land swap agreements and purchase and sale agreement and the time of the trial on damages, the value of building lots in the area of the subdivision in which the plaintiffs' lots were situated had escalated from about $15,000 to $150,000.

of their lots that the plaintiffs are ordered to transfer upon the conveyance of lots 46 and 50 of the subdivision.[8,9]

3. *The issues.* On these cross appeals, the plaintiffs argue that the judge was in error in denying their motions for summary judgment against Eastland and allowing Eastland's cross motion. They advance numerous theories in support of their claim that Eastland was obligated to honor their land swap agreements with Hopedale.

Although Hopedale does not appeal from the determination of its liability for breach of the land swap agreements, it argues that the judge abused his discretion in ordering it to attempt to purchase the property from Eastland or the current owner for purposes of performing the land swap agreements. Hopedale also contends that the judge erred in his calculation of any monetary damages owed the plaintiffs.

4. *The plaintiffs' appeal.* In taking up the plaintiffs' appeal from the allowance of Eastland's motion for summary judgment, we consider the materials submitted on the motion in the light most favorable to the plaintiffs and affirm the judgment in Eastland's favor only if those materials show that the plaintiffs had no reasonable expectation of proving an essential element of their claim. See *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991). In contending that summary judgment

---

[8]The judge stated in his memorandum of decision after the trial on damages that a conveyance of the plaintiffs' Mill Street properties without receiving lots 46 and 50 in return would leave the plaintiffs insufficient road frontage to comply with local zoning requirements and that the monetary damages were then to be viewed as being awarded as the value of the benefit of the plaintiffs' bargains with Hopedale.

[9]Paragraphs five and six of the final judgment read:

"5. In the event that the current owner is unwilling to sell lots 46 and 50 to the defendant Hopedale . . . or seeks a purchase price in excess of the fair market value as stated in the decision of the court dated March 11, 2005, the defendant is ordered to pay $150,000 to each of the joint plaintiffs.

"6. If the plaintiffs are thereafter able to and do acquire said lots pursuant to the court's decision of March 11, 2005, either directly from the current owner or indirectly from Hopedale . . . , then they are to convey those portions of their existing lots to Hopedale . . . that they had previously agreed to convey in their agreement with Hopedale . . . ."

for Eastland was erroneously entered, the plaintiffs press four arguments: (a) because Eastland purchased the property with actual knowledge of the land swap agreements between the plaintiffs and Hopedale, Eastland was not a bona fide purchaser of the property in dispute and, therefore, took the property subject to their rights; (b) Hopedale was acting as Eastland's agent when it entered into its agreements with the plaintiffs and, therefore, bound Eastland to the terms of the land swap agreements with the plaintiffs; (c) the plaintiffs are intended third party beneficiaries of Eastland's promise under its purchase and sale agreement with Hopedale to carry out the land swap agreements with Hopedale, and (d) Eastland had waived, or was otherwise precluded from asserting, any rights conferred to it under paragraph 32B of its purchase and sale agreement with Hopedale that was executed prior to January 30, 1998, the original closing date of the sale between Hopedale and Eastland.

a. *Priority of interests.* The plaintiffs' equitable interest in the property came into being at the time the land swap agreements were executed on April 1, 1998, that is, at a time subsequent to the January 30, 1998, deadline mentioned in the purchase and sale agreement entered into by Eastland and Hopedale on November 17, 1997. Consequently, Eastland holds the superior equitable interest in the subdivision lots. See *Linse* v. *O'Meara*, 338 Mass. 338, 346 (1959). See also Restatement (Second) of Contracts § 146 & comment a (1981) (where owner of property makes two agreements to sell same property to different buyers, first in time ordinarily has priority). In short, the plaintiffs' junior equity is not entitled to greater protection on the basis that Eastland knew of its existence before it took title to the property. See *Linse* v. *O'Meara, supra.*

b. *Agency.* An agency relationship arises "when there is mutual consent, express or implied, that an agent is to act on behalf and for the benefit of the principal, and subject to the principal's control." *Theos & Sons* v. *Mack Trucks, Inc.*, 431 Mass. 736, 742 (2000). See Restatement (Second) of Agency § 1 (1958). The plaintiffs, however, have failed to identify any specific words or conduct by which consent was manifest or from which it could be implied.

It is the plaintiffs' contention that Hopedale had actual or ap-

parent authority to bind Eastland to the terms of the land swap agreements by reason of the purchase and sale agreement which they claim gave rise to an equitable interest in the property that, in turn, authorized Hopedale to enter into the land swap agreements. Standing alone, Eastland's equitable interest in the property is insufficient to support an assertion of an agency relationship based on actual or apparent authority.[10]

To establish the existence of actual or apparent authority, the plaintiffs had to show indisputably that Eastland explicitly or impliedly manifestly agreed or consented that Hopedale should execute the land swap agreements on its behalf. *Theos & Sons v. Mack Trucks, Inc.*, *supra* at 743 n.13. See Restatement (Second) of Agency § 1. Our review of the summary judgment materials shows that the plaintiffs have failed to identify any specific words or conduct by which Eastland's consent was either manifested or could be implied.

In order to bind Eastland to the terms of any land swap agreements on a theory of apparent authority, the plaintiffs would have to show some word or conduct on the part of Eastland, the principal, and not Hopedale, the agent, that caused them reasonably to believe that Hopedale was authorized to act on Eastland's behalf in executing a land swap agreement. See *Hudson v. Massachusetts Property Ins. Underwriting Assn.*, 386 Mass. 450, 457 (1982); *Haufler v. Zotos*, 446 Mass. 489, 497 n.22 (2006); *Ruble v. Hayden, Harding & Buchanan, Inc.*, 15 Mass. App. Ct. 252, 255 (1983). There is, however, nothing in the materials before us to show any communication between the plaintiffs and Eastland or that the plaintiffs understood Hopedale to be acting on another's behalf. To the contrary, it is undisputed that the plaintiffs were unaware of Eastland's exist-

---

[10]In their reply brief, the plaintiffs assert that "express authority was conferred by virtue of the purchase and sale agreement." It is not at all clear to us whether the plaintiffs intend by this statement to advance a theory distinct from their argument based on the existence of equitable interests. In any event, it is unsupported by citation to pertinent legal authority or any discussion as to how the specific terms of the purchase and sale agreement demonstrated that an agency relationship existed. Because this belated assertion fails to rise to the level of acceptable appellate advocacy, and based upon our long-standing rule of appellate procedure, we do not consider it. See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975). See also *Carter v. Empire Mut. Ins. Co.*, 6 Mass. App. Ct. 114, 122 n.8 (1978).

ence when they executed the land swap agreements. Consequently, the doctrine of apparent authority is inapt. See *Essex County Acceptance Corp.* v. *Pierce-Arrow Sales Co.*, 288 Mass. 270, 276 (1934); *Commercial Credit Corp.* v. *Stan Cross Buick, Inc.*, 343 Mass. 622, 626 (1962). See also Restatement (Second) of Agency § 8, comment a (1958) (apparent authority exists only with regard to those who believe and have reason to believe there is authority; there can be no apparent authority created by undisclosed principal).

c. *Third party beneficiaries.* To prevail on a breach of contract claim as third party beneficiaries, the plaintiffs must show that they were "intended" and not "incidental" beneficiaries of the purchase and sale agreement between Hopedale and Eastland. See *Rae* v. *Air-Speed, Inc.*, 386 Mass. 187, 194-195 (1982); *Anderson* v. *Fox Hill Village Homeowners Corp.*, 424 Mass. 365, 366 (1997); *Lakew* v. *Massachusetts Bay Transp. Authy.*, 65 Mass. App. Ct. 794, 797 (2006); Restatement (Second) of Contracts § 302 (1981).[11] While claiming to be third party beneficiaries, the plaintiffs curiously place principal reliance on *Loranger Constr. Corp.* v. *E.F. Hauserman Co.*, 376 Mass. 757, 760-761 (1978), a case having nothing to do with third party beneficiaries but which is, instead, concerned with the questions whether and when a promise may be enforceable by reason of a promisee's reasonable reliance. Otherwise, the plaintiffs offer nothing in support of their claim that they are third party beneficiaries. In view of all that we have said before and the plaintiffs' failure to address this claim within the meaning of Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975), we

---

[11]The court adopted Restatement (Second) of Contracts § 302 in *Rae* v. *Air-Speed, Inc., supra* at 195. That section reads:

"(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance. (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary."

need say no more. See *Ging Jew Yung* v. *Reymonde*, 433 Mass. 1001, 1003 (2000). See also note 10, *supra*.

d. *Waiver*. Asserting that because Eastland was aware of the land swap agreements at the time the purchase and sale agreement between Hopedale and Eastland was entered into and subsequently amended to extend the closing date but Eastland did not at any time object to those agreements, the plaintiffs allege but do not argue that it must be inferred that Eastland ratified the land swap agreements and that it waived any objections to the timeliness of those agreements when it agreed to "attempt to work something out" with the plaintiffs after the closing. Again mindful of the rule of appellate practice that mere allegations and conclusory assertions do not constitute argument within the meaning of Mass.R.A.P. 16(a)(4), we do not consider the plaintiffs' claim of waiver. Even were we to do so, our conclusion would be no different for the following reasons.

It should be recalled that even though paragraph 32B of the purchase and sale agreement provides in pertinent part that at the time of the closing between Eastland and Hopedale, the land swap agreements would be assigned to Eastland who agreed to abide by the terms thereof, paragraph 32B and letters to Hopedale from Eastland's attorney made clear its position that the provisions of any land swap agreements were to be limited to purchase and sale agreements entered into prior to January 30, 1998. Moreover, taking the undisputed facts presented on the cross motions for summary judgment, Eastland's obligation to accept assignment of the land swap agreements executed by Hopedale was expressly made subject to Eastland's prior approval of the proposed exchange. At some time during 1997, Hopedale provided Eastland with details of the proposed exchange about which Eastland had concerns regarding whether the new lots would be buildable lots. Eastland communicated its concerns to Hopedale and asked Hopedale to submit an alternative proposal or more information before Eastland would approve the land swap as proposed.

The plaintiffs point to nothing in the record to show that Hopedale either secured Eastland's approval of the exchange as initially proposed or suggested an alternative proposal. Moreover,

there is evidence to the contrary, i.e., correspondence between Hopedale and Eastland in April and May, 1998, relative to the proposed land swap, the substance of which we need not detail. It is enough to say that weeks before the closing, Eastland indicated to Hopedale that it would be unable to make any decisions respecting a land swap because Eastland had been engaged in developing other areas of the subdivision and was not sufficiently familiar with the area under discussion to evaluate its potential uses. Nonetheless, Eastland advised that it was willing to meet with Hopedale once Eastland had more familiarized itself with the site. At the closing on June 1, 1998, Eastland refused to accept an assignment of the land swap agreements and, instead, agreed that it would "attempt in good faith to work something out" after the closing.

"Waiver is the intentional relinquishment of a known right." *Niagara Fire Ins. Co.* v. *Lowell Trucking Corp.*, 316 Mass. 652, 657 (1944). In light of paragraph 32B of the purchase and sale agreement, Eastland's historic objections to the land exchange negotiated by Hopedale, the tenor of its communications following Hopedale's belated disclosure to Eastland of the land swap agreements, and Eastland's vague and noncommittal statement that it would "attempt to work something out" with the plaintiffs, we conclude that it cannot be inferred reasonably that Eastland ratified the land swap agreements between Hopedale and the plaintiffs or voluntarily waived the right to object to them.

5. *Hopedale's appeal.* Pursuant to paragraphs four, five, and six of the final judgment, Hopedale is to purchase lots 46 and 50 from Eastland and perform the land swap agreements with the plaintiffs or pay them sufficient funds so that they can directly purchase the lots from Eastland. If the parties are unable to acquire the lots from Eastland, the judgment requires Hopedale to pay the plaintiffs damages in the amount of the value of the lots as of 2005. In the event the plaintiffs thereafter acquire the subdivision lots in question directly or indirectly from either the current owner or Hopedale, they are then to convey that portion of their Mill Street properties comprehended by their land swap agreements to Hopedale.

Hopedale raises the following challenges to the judgment. It

argues that because the land swap agreements contemplated a simple exchange of land, the requirement that it attempt to repurchase the lots or to provide the plaintiffs with the funds to repurchase the lots amounts to an impermissible revision of the agreements; or, in the alternative, this order to repurchase imposes an undue hardship on Hopedale due to the substantial appreciation in the value of the lots. Hopedale also argues that, should it not prove able to repurchase the lots, the amount it is ordered to pay the plaintiffs should be reduced on two bases: (1) by valuing the property as of the time Hopedale was due to perform the land swap and not as of the time of trial; and (2) by a further reduction in the amount due by subtracting the value of the property that the plaintiffs were to convey to it under the land swap agreements from the amount it is ordered to pay at the time set for performance of the land swap agreements.

a. *Paragraph four of the final judgment.*[12] Massachusetts has long refused to direct a defendant without title to land to specifically perform an agreement concerning its conveyance where it is shown that the defendant (in this case, Hopedale) has already transferred the property to a bona fide purchaser (here, Eastland). See *Milkman* v. *Orway*, 106 Mass. 232, 254, 260 (1870); *Limpus* v. *Armstrong*, 3 Mass. App. Ct. 19, 24 (1975). Courts in other jurisdictions, often in categorical and unconditional terms, have refused to order specific performance of a contract to convey land where the seller does not hold title to the property in issue. In refusing to order specific performance, these jurisdictions, like Massachusetts, generally cite to the impossibility of conveying what one does not own, as such a judgment is incapable of enforcement.[13]

In the present case, however, Hopedale's obligation to convey

---

[12]Paragraph four of the judgment provides in pertinent part:

"Hopedale . . . shall purchase Lots 46 and 50 from [Eastland] and having done so, [Hopedale] is to convey said lots to the plaintiffs . . . . Upon doing so, the plaintiffs shall convey the portion of their lots that they had intended to transfer to [Hopedale]."

[13]See *Halsell* v. *Renfrow*, 202 U.S. 287, 292 (1906); *Cattell* v. *Jefferson*, 51 F.2d 317, 318 (D.C. Cir. 1931); *Sands* v. *United States*, 198 F. Supp. 880, 883 (W.D. Wash. 1960), aff'd sub nom. *First Federal Sav. & Loan Assn.* v. *United States*, 295 F.2d 481 (9th Cir. 1961); *Canton* v. *Monaco Partnership*, 156

390       68 Mass. App. Ct. 377 (2007)

Normandin *v.* Eastland Partners, Inc.

the lots to the plaintiffs is conditioned upon its ability to obtain the lots from Eastland. We do not read *Milkman* v. *Orway, supra,* and *Limpus* v. *Armstrong, supra,* as establishing, per se, a bar to specific performance under the circumstances of this case, nor do we view that part of the judgment here in issue as one mandating specific performance. Those cases, therefore, are distinguishable from the one before us, because concerns about requiring a party in breach to undertake, or a court to enforce, a performance that the defendant is literally incapable of rendering are not implicated here.

Specific performance is an "extraordinary equitable remedy," see *Hunt* v. *Rice,* 25 Mass. App. Ct. 622, 633 (1988), which should be no more intrusive than necessary to secure the injured parties' rights. See *Haverty* v. *Commissioner of Correction,* 440 Mass. 1, 7 (2003), citing *Boston Teachers Union, Local 66* v. *Boston,* 382 Mass. 553, 556 (1981). Cf. *Perez* v. *Boston Housing Authy.,* 379 Mass. 703, 730 (1980). These cases teach that the imposition of equitable remedies, when considered in light of concerns regarding futile or nugatory orders, must be justified by a degree of assurance stronger than a mere possibility that the exercise of equitable powers will vindicate a plaintiff's rights.

Hopedale has not argued on appeal that any attempt to purchase the property would be futile. Moreover, the record before us shows that Eastland purchased the subdivision lots as investment property for development and resale and that while it refused to perform the land swap agreements negotiated by Hopedale, it did attempt to negotiate different agreements with the plaintiffs. Therefore, it is not wholly improbable that Eastland would be willing to sell the subdivision lots to Hopedale or the plaintiffs, albeit under terms other than those set out in the land swap agreements.

For all the above discussed reasons, we see no definite and manifest futility in paragraph four of the judgment that would justify its reversal on the basis of an impossibility to perform as

Ariz. 468, 470 (1987); *Samara Dev. Corp.* v. *Marlow,* 556 So.2d 1097, 1101 (Fla. 1990); *Threlkeld* v. *Norris,* 300 Ill. 223, 225 (1921); *Davis* v. *Winter,* 168 Md. 613, 618-619 (1935); *Arhart* v. *Thompson,* 75 N.D. 189, 194-197, 205 (1947); *Herley, Inc.* v. *Harsch,* 61 Ohio App. 260, 263-264 (1938).

ordered. See *Bodio* v. *Ellis*, 401 Mass. 1, 10 (1987); *Demoulas* v. *Demoulas*, 428 Mass. 555, 591 (1998).

Hopedale also attacks paragraph four of the judgment on the basis that the remedy set out therein constitutes an impermissible revision of the land swap agreements. See e.g., *Epdee Corp.* v. *Richmond*, 321 Mass. 673, 675-676 (1947); *Hook Brown Co.* v. *Farnsworth Press, Inc.*, 348 Mass. 306, 312-313 (1965); *Van Dusen Aircraft Supplies of New England, Inc.* v. *Massachusetts Port Authy.*, 361 Mass. 131, 142-143 (1972); *Sancta Maria Hosp.* v. *Cambridge*, 369 Mass. 586, 595-596 (1976); *King* v. *Allen*, 5 Mass. App. Ct. 868, 870 (1977), all cases in which the relief ordered by the court was disallowed on appeal as it effectively altered the exchange between the parties. The remedy fashioned by the judge in the case before us violates no express terms of the land swap agreements.

Hopedale's agreements with the plaintiffs required it to deliver to them title to lots 46 and 50. Hopedale entered into those agreements with the plaintiffs with the expectation that Eastland would hold title to the subdivision lots at the time performance was due with the intention of fulfilling Hopedale's contractual obligations to the plaintiffs by assigning the agreements to Eastland and securing Eastland's promise to abide by their terms. But see parts 4(a) through 4(d), *supra*. However, the order fashioned by the judge is crafted in terms to assure Hopedale's performance of its agreements, if possible, and places the plaintiffs in no different a position than what they would have occupied in the absence of Hopedale's breach. Paragraph four of the final judgment, therefore, does not alter the parties' agreements. Rather, it alters the manner by which Hopedale is to perform its contractual obligation.

Hopedale's last challenge to paragraph four of the final judgment is that because of the increase in the value of the land, it is unduly burdensome and plainly inequitable to require that it purchase the property from Eastland so that it then can perform the agreed upon swap with the plaintiffs. The short answer to Hopedale's argument is stated in *Costello* v. *Pet Inc.*, 17 Mass. App. Ct. 382, 388 (1984):

"Mere increase in the value of the property, which did not

result from action of the defendant after the breach, is not the type of change in circumstances over time which would make an order of specific performance inequitable. Contrast *Gevalt* v. *Diwoky*, 319 Mass. 715, 716 (1946)."[14]

See *Lee* v. *Kirby*, 104 Mass. 420, 428 (1870); *Roberts* v. *Cambridge*, 170 Mass. 199, 202 (1898); *Evangelista* v. *Holland*, 27 Mass. App. Ct. 244, 249 (1996).

There is no question in the case before us that the land swap agreements were fair at the time of their making. The record before us does not reveal just what factors may have caused or contributed to the property's rise in value. However, it is not contended that the rise was due to Hopedale's efforts or was occasioned by extraordinary or unforeseen circumstances. The mere fact that the property in issue increased in value is an insufficient basis to support a conclusion that the judge abused his discretion in ordering Hopedale to perform its agreements with the plaintiffs, especially in view of the fact that paragraphs five and six of the final judgment appear to cap the price to be paid by Hopedale in attempting to purchase lots 46 and 50.

b. *Paragraphs five and six of the final judgment.* As set out in note 9, *supra,* paragraphs five and six of the final judgment provide that if an exchange cannot be brought about by means of Hopedale's purchase of lots 46 and 50 from Eastland or the current owners, the plaintiffs would then be entitled to the "benefit of their bargain" with Hopedale for its breach of the land swap agreements. See note 8, *supra.* The judge equated the plaintiffs' "benefit of their bargain" with the market value of the lots at the time of trial.[15]

It is a well-settled rule that a plaintiff in an action for breach of contract is entitled to damages in an amount sufficient to put him in as good as, but not better than, the financial position he would have been in had there been no breach. See *Hall* v. *Paine,*

[14]In *Gevalt* v. *Diwoky*, 319 Mass. at 716, the court held that the "belated specific enforcement of the contract after the defendant for many months had been increasing the value of the premises by reducing the mortgage thereon would . . . be inequitable."

[15]Neither the plaintiffs nor Hopedale contend that the monetary portion of the judgment was determined on a basis other than the "benefit of the bargain." Nor do they argue that we should analyze the award under any other theory of recovery.

224 Mass. 62, 65 (1916); *Bucholz* v. *Green Bros. Co.*, 272 Mass. 49, 54 (1930); *Ficara* v. *Belleau*, 331 Mass. 80, 82 (1954); *Foster* v. *Bartolomeo*, 31 Mass. App. Ct. 592, 595-596 (1991). The usual measure of damages for breach of a purchase and sale agreement is the difference between the contract price and the fair market value of the land as of the date the conveyance was to occur. See *Widebeck* v. *Sullivan*, 327 Mass. 429, 434 (1951); *American Mechanical Corp.* v. *Union Mach. Co. of Lynn, Inc.*, 21 Mass. App. Ct. 97, 101-102 (1985); *Zolner* v. *THN Inv., Inc.*, 21 Mass. App. Ct. 927, 928 (1985).

Hopedale argues that the judge's failure to reduce the awards of $150,000 to the Normandins and $150,000 to the Nuttings by the value of the properties they were to convey to it under their land swap agreements resulted in a windfall to them. They also contend that the plaintiffs' loss is to be measured as of the time performance was due and not as of the time of trial. There is force to Hopedale's arguments.

By its express terms, paragraphs five and six of the judgment awards the plaintiffs the full market value of the two subdivision lots in issue at no cost to themselves unless subsequent to Hopedale's payment of the damage awards they are able to purchase the lots 46 and 50. Then and only then are the plaintiffs required to convey their Mill Street properties to Hopedale. Because the final judgment provides that the plaintiffs would receive the subdivision lots without conveying to Hopedale the easterly portions of their Mill Street properties, the award fails to comport with the bargain made by the plaintiffs and Hopedale and exceeds what the plaintiffs may lawfully claim as their "expectation" under their land swap agreements with Hopedale. It follows that the damage awards must be reduced by the amount the plaintiffs were to pay for the subdivision lots as measured by the fair market value of their Mill Street properties.

As a general rule expectation damages for breach of a land sale contract are measured as of the date the conveyance was to occur. See *Widebeck* v. *Sullivan, supra*; *American Mechanical Corp.* v. *Union Mach. Co. of Lynn, Inc., supra.* The plaintiffs assert that this measurement does not fully compensate them for their actual loss, i.e., the appreciated value of the lots, and that the trial judge correctly assessed damages on the basis of the fair market value of the property as of the date of trial.

In support of their contention, the plaintiffs rely on *American Mechanical Corp.* v. *Union Mach. Co. of Lynn, Inc., supra.*[16] In that case, the plaintiff sought damages that resulted from the defendant's breach of a contract to purchase commercial real estate, machinery and equipment. Because the defendant was aware at the time of the agreement that a foreclosure sale was likely to happen if the sale of the property did not take place, and because there was nothing to show that the plaintiff failed to act reasonably to avoid the loss, the plaintiff was awarded damages in the amount of the difference between the contract price and the sum received from the bank's foreclosure sale. In approving the award, the court stated:

> "The usual formula for measuring damages for breach of a real estate purchase and sale agreement — the difference between the contract price and the market value on the date of the breach — is merely a different formulation of the general rule for measuring contract damages. In the usual case, the contract price less the market value represents the seller's actual loss, and the formula, therefore, affords the injured seller an adequate remedy. In some cases, however, the actual loss suffered as a result of a breach exceeds the amount yielded by that formula. The question is whether, because the contract involves the sale of real estate, we may not, in such cases, refer to that aspect of the general rule of contract damages which gives recognition to actual losses sustained as a result of a breach when the losses are reasonably foreseeable or within the contemplation of the parties. That principle has been applied to contracts which are exclusively for the sale of real estate when the particular circumstances are such that the usual rule produces an inadequate remedy."

*Id.* at 101-102.

We do not think that this case presents an occasion for a departure from the general rule that damages for breach of a land sale contract are to be measured as of the time performance

---

[16] The plaintiffs also cite *GTE Prod. Corp.* v. *Broadway Elec. Supply Co.*, 42 Mass. App. Ct. 293, 296 (1997), in which the court discusses the inapposite measure of damages to be applied in cases involving the tort of intentional misrepresentations.

was due. The plaintiffs' claim is one that could be made in contradiction of the general rule by almost all buyers when a seller is in breach of a contract for the sale of real estate. To the extent the plaintiffs' complaints about the loss of the appreciation value of the lots in question seem somewhat reasonable, it should be remembered that they are entitled to interest on the judgment. See G. L. c. 231, § 6C, as amended by St. 1982, c. 183, § 3.

6. *Conclusion.* Paragraphs one, two, three, and four of the final judgment are affirmed. Paragraphs five and six of the final judgment are vacated, and the matter is remanded to the Superior Court for a recalculation of the damages due the plaintiffs in the event there can be no exchange of lots 46 and 50 of the subdivision for the plaintiffs' portions of their Mill Street properties. Any such monetary damages are to be determined on the basis of the value of the parties' properties as of the date of the breach of the land swap agreements.

*So ordered.*