Fabricant, Judith, J.
This action arises from a dispute over a commercial lease. The plaintiff tenant, MeadWestvaco Corporation, terminated the lease, contending that it had the right to do so because of the landlord’s failure to maintain the roof.[2] It seeks damages resulting from roof defects, as well as damages based on certain allegedly improper charges. MeadWestvaco has also joined its sub-tenant, Rand Whitney Industries Corporation, seeking, in substance, indemnification in the event that Rand Whitney’s continued occupancy subjects MeadW-estvaco to liability for holdover rent. The defendant landlord, Worcester New Bond, LLC,[3] contends that the roof was adequately maintained, that the tenant had no right to terminate and acted in bad faith in purporting to do so, that the charges were proper, and that the tenant has waived any claim for improper charges; it seeks a declaration that the lease remains in effect, damages for the tenant’s failure to pay rent, and other relief. Before the Court are the landlord’s motion for summaiy judgment on all MeadWestvaco’s claims and on certain of its counterclaims; MeadWestvaco’s motion for summaiy judgment on certain of each side’s claims; and Rand Whitney’s motion for summary judgment on all claims against it. For the reasons that will be explained, the landlord’s motion will be allowed in part and denied in part; MeadWestvaco’s motion will be denied; and Rand Whitney’s motion will be allowed.
BACKGROUND 1. The Roof
The premises in issue consists of 151,519 square feet of space in an old warehouse-type building located at 10 New Bond Street in Worcester.[4] Through its predecessor, MeadWestvaco entered into the lease in 2000, for a ten-year period ending in 2010. Inspections prior to the lease identified issues related to the roof, as well as other conditions in the building, and the lease contained provisions to address those issues.
The lease provided, in article III, that the landlord would “perform certain work and improvements” prior *366 to the commencement date of the lease, and that no rent would be due until sixty days after the commencement date, defined in article 3.2 as “the date the Landlord’s Work shall be deemed by the Tenant substantially complete.” Under article 3.4, the tenant would be entitled to inspect the work on the commencement date, and “except to the extent to which the Tenant shall have given the Landlord notice as to the respects in which the Landlord has not performed Landlord’s Work or in which the Premises are unacceptable, which notice shall be given by Tenant to landlord within sixty (60) days following the Commencement Date, Tenant shall have no claim that the landlord has failed to perform any of Landlord’s Work or regarding the condition of the Premises on the Commencement Date. As of the Commencement Date, Tenant shall be deemed to have accepted the Premises in their ”as is" condition . . . except for any punch-list items remaining to be completed and any items identified in the sixty (60) day period following the Commencement Date."
The work to be done, set forth on Exhibit C to the lease, included among other items “Landlord to repair or replace existing roof as required to provide weather tight roof.” In addition to the work to be done at the outset, the lease provided at article 7.1 that the landlord would be responsible “to keep in good order, condition and repair the roof’ and specified other portions of the building. The inner surface of the ceiling and other inner portions of the space were the tenant’s responsibility.
The lease provides at article 3.2 for a term of ten years from the commencement date, unless extended under certain provisions, or “sooner terminated as herein provided.” At article 6.2, the lease gives the landlord the right to terminate if the tenant requests to sublet more than -fifty percent of the premises. Under articles 13.2 and 13.3, either the tenant or the landlord would have the right to terminate in the event of fire or other casualty causing damage that could not be repaired within 90 days or eminent domain taking that would prevent the tenant from conducting its business. Under article 14.1, the landlord has the right to terminate, and to reclaim possession, in the event of various specified defaults by the tenant. Article 14.2 addresses default by the landlord; it provides that the landlord is not in default unless it has failed to cure within a reasonable time after notice from the tenant. Article 14.2 is silent as to what if any remedies the tenant may have for default by the landlord. Article 15.5, entitled “Limitation of Liability,” provides that, “In no event shall Landlord ever be liable to Tenant, or Tenant liable to Landlord, for any indirect, special or consequential damages suffered by either from whatever cause.”
MeadWestvaco is in the business of manufacturing envelopes. The lease recited at article 1.3 that it would use the space for “envelope making, printing and packaging operations, general office use and as a warehouse and distribution center.” MeadWestvaco built out part of the space for office use and part for warehouse and manufacturing use. Effective May 1, 2000, it notified the landlord of its acceptance of the space pursuant to article 3.2, and the lease term commenced on that date. MeadWestvaco offers evidence, however, that shortly thereafter it notified the landlord of puddles on the floor that it attributed to roof leaks. The parties offer conflicting evidence as to whether MeadWestvaco informed the landlord of any roof problems over the next three-year period.
In 2002, after the merger between Mead and Westvaco, MeadWestvaco shut down its manufacturing operation at the site, and initiated efforts to sublease portions of the space that it was not using. It notified the landlord of its intention to sublease more than fifty percent of the space, but the landlord did not elect to terminate.
In August 2003, leaking damaged portions of an office area, although the landlord offers evidence to suggest that the leaking at that time may have resulted from work MeadWestvaco had done in the building. Shortly thereafter, MeadWestvaco sent the landlord a notice of default, dated September 25, 2003, asserting that “the failure of the Landlord to keep the roof of the Premises in good order, condition, and repair . . . constitutes a material default.” The letter claimed that the tenant had suffered damages to its inventory and other property, interference with its operations, and interference with its ability to sublease. Thereafter, the landlord made various repairs; the parties offer evidence that would support conflicting inferences as to extent of the problem, the scope of the repairs performed, and their effect.
In October 2003, MeadWestvaco entered into a sublease with Rand Whitney for 30,000 square feet. The sublease included a provision that MeadWestvaco would not be responsible for any claims for damage to the sub-tenant’s property “by reason of roof leaks or any other condition.” At the same time, MeadWestvaco provided a certification of its belief that the landlord “is not in default of any of its obligations under the lease,” subject to completion of certain roof repairs. In June 2004, the sublease was expanded to encompass some 80,000 square feet. Rand Whitney renewed the sublease in January of 2007, for a term coextensive with the lease. Rand Whitney continues to occupy the sub-leased portion of the premises and to conduct its business of cardboard and paper processing and storage there, and continues to pay rent under its sublease.[5] Rand Whitney has not expressed a desire to terminate the sub-lease or to vacate the premises.
MeadWestvaco continued to use a portion of the premises for a printing center until it relocated that operation in 2006. From 2006 to the present MeadW-estvaco has not occupied any part of the premises. MeadWestvaco undertook to sublet the remainder of *367 the premises, apparently without success. The parties offer evidence that would support conflicting inferences as to the extent of leaking between 2003 and 2006, the recommendations of various experts, the efforts the landlord made to correct the problems, and what, if any, role the roof issues had on MeadWestvaco’s efforts to sublease.[6]
On December 28, 2006, MeadWestvaco sent the landlord a second notice of default, asserting that the landlord was in default of its obligation to “keep the roof of the premises in good order, condition and repair,” and that “[b]ecause of the Landlord’s repeated and continuing failure to repair the roof, landlord’s default is a material default . . . Landlord’s failure to cure this breach will result in Tenant terminating the Lease.” The letter went on to set out a history of roof-related issues since 2003, asserting that, in response to its repeated notices, the landlord had “sporadically performed limited and totally inadequate” repairs.
The landlord responded with a letter dated February 12, 2007, from its counsel. The letter asserted that the roof issues identified had been resolved, that insufficiently specific information had been provided as to any further problems, and that “as far as we know, there are no current problems with the roof.” The letter enclosed a document from the landlord’s roofing contractor showing areas that had been replaced in recent years and areas scheduled to be replaced in 2007. Finally, the letter asserted the landlord’s contention that MeadWestvaco had no right of termination under the lease, that it “may be attempting to utilize the alleged problems with the roof as a pretense to get out of a Lease for Premises that it no longer needs due to its recent corporate reorganization,” and that the landlord would view such conduct as in bad faith and would seek remedies under G.L.c. 93A.
On March 12, 2007, MeadWestvaco commenced this action, seeking a declaratory judgment that it was entitled to terminate the lease, along with damages for the landlord’s breach. On May 31, 2007, before any substantive action on its complaint, MeadWestvaco sent the landlord notice that it was terminating the lease effective June 30, 2007. On the same day as its notice of termination, MeadWestvaco sent notice to Rand Whitney asserting that, as a result of its termination of the lease, Rand Whitney’s sub-lease would also terminate on June 30, 2007. MeadWestvaco followed up with another notice, dated June 19, 2007, threatening eviction. This second letter pointed out the penally for holding over provided in article 15.19 of the lease, under which, MeadWestvaco suggested, Rand Whitney’s failure to vacate upon termination could result in MeadWestvaco being liable for one and one-half times the rent under the lease. That provision, as MeadWestvaco pointed out, was incorporated in the sub-lease.
Rand Whitney did not vacate, and, on July 13, 2007, the landlord sent a letter to MeadWestvaco asserting, as MeadWestvaco had anticipated, that if the lease had been effectively terminated as MeadW-estvaco contended, then Rand Whitney’s continued occupancy constituted a holdover under article 15.19, rendering MeadWestvaco liable for one and one-half times rent as provided there. MeadWestvaco responded by filing an action in the Worcester District Court against Rand Whitney for summary process. On August 8, 2007, this Court ordered that action transferred and consolidated with this case.
2. Operating Costs
Article 10.1 of the lease requires the tenant to pay “additional rent,” including a proportional share of “Operating Costs.” Payment is to be made based on monthly bills, subject to adjustment at the end of each calendar year. Article 10.3 defines “Operating Costs” as “the costs of fire, casualty and commercial general liability insurance on and for the Property, common area maintenance, including landscaping, snowplowing and common area utilities, reasonable site payroll expenses incurred by Landlord (but not greater than 25% of the payroll expenses of two site personnel) and any and all expense incurred by Landlord in connection with any law, rule, ordinance or regulation of any governmental authority other than for Environmental Matters for which Landlord is responsible hereunder.”[7] Article 10.3 goes on to give the tenant the right to review “documentation relative to the computation of Operating Costs” once in each calendar year.
Each month during MeadWestvaco’s tenancy, the landlord has provided it with a bill, and each year it has provided a reconciliation statement, showing an amount due for MeadWestvaco’s share of operating expenses, and the calculation underlying that determination. Each reconciliation statement showed charges in categories including “Payroll & Related,” “Common Area Repairs & Maintenance,” “General and Administrative,” and “Maintenance Fee.” MeadW-estvaco exercised its right to review the underlying documentation once, in 2002, for calendar year 2001. At that time it raised issues regarding certain charges that it contended were “tenant specific,” and also questioned the charges for management fees. A series of discussions and correspondence followed during 2002, in which the landlord conceded certain charges, amounting to some $9,294, defended others as legitimate common area charges, and defended the imposition of management fees as a “common practice within the real estate industry” that had been discussed and agreed to between the parties at the time the lease was negotiated.[8] The landlord proposed an amendment to the lease that would explicitly include management fees. MeadWestvaco did not agree to that proposal, but it did pay the charges imposed for 2001.[9]
From 2002 until it terminated the lease in 2007, MeadWestvaco did not again exercise its right to review *368 documentation underlying the annual reconciliation, and did not again raise any challenge to the operating expenses charged. It paid each year’s charges through June 30, 2007, including a total of $178,426 in management fees. MeadWestvaco contends that, despite its lack of protest during these years, the landlord was aware of its continuing objection to the imposition of management fees. It contends also that the reconciliation statements provided to it during those years reflected improper charges, including inflated calculation of payroll expenses and employee related costs, and certain tenant-specific charges. Review of the materials offered with respect to the claim of improper charges reveals conflicting evidence.
In 2003 and 2004 — that is, after MeadWestvaco had raised the issue of management fees under its lease— the landlord entered into leases with two other tenants for other portions of the property, Reed Machinery and Abby Kelly Foster Regional Charter School. Those leases contained definitions of operating expenses that were identical to each other and significantly different from the definition in MeadWestvaco’s lease; these later leases provided that “The costs and expenses incurred by Landlord with respect to the following categories shall constitute Operating Expenses for all purposes under this Lease.” There followed a list of seven items, one of which was “Management Fee.”
3. The Pleadings
MeadWestvaco filed an amended complaint on September 12, 2007, asserting five counts against the landlord: breach of the lease by failing to maintain the roof (count one); violation of G.L.c. 93A by failing to maintain the roof, to follow professional recommendations, and to inform MeadWestvaco of those recommendations (count two); breach of the lease by charging as operating costs items not authorized by the lease (count three); fraud by charging for items it knew were not authorized by the lease and making false statements regarding such charges (count four); and violation of G.L.c. 93A based on the same conduct (count five).
MeadWestvaco’s amended complaint also included three counts against Rand Whitney, seeking damages “for any amounts MeadWestvaco is obligated to the Landlord for under the Lease as a result of Rand Whitney’s continued occupancy of the Premises after termination of the Lease and Sublease” (count six); indemnification for holdover liability (count seven); indemnification for use and occupancy (count nine); and summary process (count ten).
The landlord responded with a counterclaim, which it has since amended; as amended the counterclaim presents five counts: breach of the lease by failing to pay rent (count one); a claim for a declaration that the lease has not been effectively terminated (count two); breach of the implied covenant of good faith and fair dealing by MeadWestvaco’s purporting to terminate the lease based on a breach by the landlord when its actual motive was to avoid its obligations under the lease (count three); violation of G.L.c. 93A based on the same conduct (count four); and the bringing of a frivolous claim in violation of G.L.c. 231, §6F (count five).[10]
The landlord now moves for summary judgment on all counts of MeadWestvaco’s claims against it, and on counts one through three of its counterclaims. Mead-Westvaco moves for summary judgment on all counts of the counterclaim, and on its claim for breach of the lease based on improperly charged operating expenses, count three of its complaint. Rand Whitney moves for summary judgment on MeadWestvaco’s claims against it.
DISCUSSION
Summary judgment will be granted when no genuine dispute exists as to any material fact and the moving party is entitled to judgment as a matter of law. See Mass.R.Civ.P. 56; Cassesso v. Commissioner of Com, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). In deciding a motion for summary judgment, the court may consider pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. Mass.R.Civ.P. 56(c); Community Nat’l Bank, 369 Mass. at 553. The Court views the facts “in the light most favorable to [the non-moving party], taking all the facts set forth in its supporting affidavits as true.” G.S. Enters., Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 263 (1991). The moving party bears the burden of affirmatively demonstrating that there is no genuine issue of material fact on every relevant issue. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 711 (1991). Once the moving party establishes the absence of a triable issue, the party opposing the motion must respond with evidence of specific facts that establish the existence of a genuine issue of material fact. Mass.R.Civ.P. 56(e); see Godbout v. Cousens, 396 Mass. 254, 261 (1985); Madsenv. Erwin, 395 Mass. 715, 719 (1985). The non-moving party cannot defeat the motion for summary judgment by resting on pleadings and mere assertions of disputed facts, but must offer evidence that would be admissible at trial. LaLonde v. Eissner, 405 Mass. 207, 209 (1989). See also Cullen Enters., Inc. v. Massachusetts Prop. Ins. Underwriting Ass’n, 399 Mass. 886, 890 (1987) (“[i]f the opposing party fails properly to present specific facts establishing a genuine, triable issue, summary judgment should be granted”).
1. MeadWestvaco’s Claims: The Roof
The first count of MeadWestvaco’s complaint alleges that the landlord breached the lease by failing to maintain the roof in good working order. To recover on this claim, MeadWestvaco must prove the basic elements of a claim for breach of contract: (1) the existence and terms of a contract supported by valid consideration; (2) that MeadWestvaco performed; (3) that the landlord breached the contract; and (4) that *369 the landlord’s breach resulted in harm or damages to MeadWestvaco. See Singarella v. City of Boston, 342 Mass. 385, 387 (1961). The damages that may be awarded on a claim for breach of contract are those that are “the direct, natural result of the breach,” and were considered by “the parties when the contract was made as the probable result of such breach.” Weeks v. Calnan, 39 Mass.App.Ct. 933, 934 (1995), citing Greany v. McCormick, 273 Mass. 250, 253 (1930).
The landlord seeks summaiy judgment on this claim on the grounds that (1) MeadWestvaco has no evidence of any direct damage or harm to itself, and (2) article 15.5 of the lease bars consequential damages, which, the landlord argues, would include any reduced opportuniiy for income from subleasing. The Court is not persuaded.
On the first point, MeadWestvaco offers evidence, which the Court must accept as true for this purpose, that it was unable to occupy certain portions of the premises because of roof leaks, and that leaks damaged improvements it had made to the premises. The inability to use part of the premises is compensable on the traditional contract theory of benefit of the bargain; that is, MeadWestvaco is entitled to recover the difference between the value of the premises for which it contracted, and the value of the premises it received. See Williams v. B&K Medical Sys., Inc., 49 Mass.App.Ct. 563, 571 (2000), citing Laurin v. DeCarolis Construction Co., 372 Mass. 688, 691 (1977) (“The basic principle of contract damages is that the aggrieved party should be put in as good a position as if the other party had fully performed”). See also Coyne Industrial Laundry of Schenectady, Inc. v. Gould, 359 Mass. 269, 277 (1971); Charles E. Burt, Inc. v. Seven Grand Corp., 340 Mass 124, 130 (1959) (measure of damages where a lessor failed to provide essential services to the leased property was “the difference between the value of what [the lessee] should have received and the fair value of what” was received). Physical harm to MeadWestvaco’s improvements also falls within standard contract damages, which include those that “flow according to common understanding as the natural and probable consequences of the breach and such as may be presumed to have been in the contemplation of the parties at the time the contract was made.” Pierce v. Clark, 66 Mass.App.Ct. 912, 914 (2006) (internal citations and quotations omitted).
As to the issue of reduced subleasing income, the landlord relies on article 15.5 of the lease, which provides that neither party will be liable “for any indirect, special or consequential damages.” The lease does not define these terms; the Court must therefore determine what the parties meant by them. In doing so, the Court must keep in mind the general rule that every contract must be “construed so as to give it effect as a rational business instrument and in a manner which will effectuate the intent of the parties.” Kingstown Corp. v. Black Cat Cranberry Corp., 65 Mass.App.Ct. 154, 158 (2005), citing New York Cent. R.R. v. New England Merchs. Natl. Bank, 344 Mass. 709, 714 (1962).
Consequential damages have been defined, variously, as those that “result! ] other than in the ordinary course of events,” Restatement (Second) of Contracts, §351, comment b (1981); “[l]osses that do not flow directly and immediately from an injurious act, but that result indirectly from the act,” Black’s Law Dictionary 394 (7th ed. 1999); and those that cannot be reasonably prevented and arise naturally from the breach, or which are reasonably contemplated by the parties," Delano Growers’ Coop. Winery v. Supreme Wine Co., 393 Mass. 666, 680 (1985); Pierce v. Clark, 66 Mass.App.Ct. at 914 (quoting Delano). The contract provision bars not consequential damages alone, but rather “any indirect, special or consequential damages.” The phrase as a whole suggests an understanding of “consequential” as indirect, in the sense of not the expected or natural result of the breach, and not foreseen or contemplated by the parties.
Here, there is no room for doubt that the parties contemplated subleasing; indeed they provided for it expressly in article 6.2. The parties thus recognized that part of the value of the lease to MeadWestvaco was the income it could earn from subleasing any portion of the premises that it chose not to use. The parties could easily foresee that a leaking roof would make the premises less desirable to potential sub-tenants, and would thus reduce sub-leasing income. Such a reduction would flow naturally and directly from the breach. The Court therefore concludes that such damages are not “indirect, special or consequential” within the meaning of article 15.5 of the lease.[11]
The landlord has thus failed to establish the absence of a genuine dispute of material fact as to count I, and the claim must stand for trial. Count two, alleging violation of G.L.c. 93A, rests on the same disputed facts. On the record presented, considering the evidence in the light most favorable to MeadWestvaco, the Court cannot conclude as a matter of law that the landlord’s conduct could not constitute a violation of c. 93A. Accordingly, count two will also stand for trial.
2. MeadWestvaco’s Claims: Operating Expenses
The dispute regarding operating expenses has two components: charges for maintenance fees, and other charges that MeadWestvaco contends were inflated or erroneous. MeadWestvaco contends that the lease does not authorize charges for maintenance fees, that it is unambiguous in that regard, and that even if it were ambiguous, it would have to be interpreted against the landlord as the drafter. As to other charges, it refers to the small amount of charges for 2001 that the parties agreed back in 2002 were erroneous, but have not been refunded, and it contends also that, in the course of discovery in this litigation, it has identified a number of other inappropriate or inflated charges. MeadWestvaco presents these claims both as breach of contract (count three), and as fraud, on the theory that the bills and *370 reconciliation statements contained material misstatements as to the basis of certain charges (count four).
The landlord responds, first, that MeadWestvaco has waived any claim with respect to operating expenses, both as to maintenance fees and as to other alleged overcharges, by paying the charges each year without objection, even after asserting its objection in 2002, and by failing since that year to exercise its right under the lease to examine the underlying documentation. The landlord contends also that the list of items set forth in the lease as included in common area maintenance is non-exhaustive, and that maintenance fees are a legitimate component of common area maintenance. As to other charges, the landlord asserts a factual dispute.
“Waiver is the intentional relinquishment of a known right.” Normandin v. Eastland Partners, Inc., 68 Mass.App.Ct. 377, 388 (2007), citing Niagra Fire Ins. Co. v. Lowell Trucking Corp., 316 Mass. 652, 657 (1944). Waiver is generally a question of fact. MacDonald & Payne Machine Co. Inc. v. Metallic Arts of New England, Inc., 324 Mass. 353, 356 (1949). However, the issue can be decided on summary judgment where the facts material to waiver are undisputed, “and only one possible inference may arise from those facts.” Dynamic Machine Works, Inc. v. Machine & Electrical Consultants, Inc., 444 Mass 768, 773 (2005), citing Central Illinois Public Service Co. v. Atlas Minerals, Inc., 965F.Sup. 1162,1174 (C.D.I11. 1997). Waiver “can be inferred from a party’s conduct and the surrounding circumstances.” Id. at 774, citing Boston Helicopter Charter, Inc. v. Agusta Aviation Corp., 767 F.Sup. 363, 372 (D.Mass. 1991). “(W]here waiver is not explicit, it must be premised on ‘clear, decisive and unequivocal conduct.’ ” Kact, Inc. v. Rubin, 62 Mass.App.Ct. 689, 695 (2004). Among the facts to be considered in a contract context is whether the contract includes an anti-waiver clause, as the lease in this case does.[12] See M.J.G. Properties, Inc. v. Hurley, 27 Mass.App.Ct. 250, 252 (1989) (“There is substantial authority against giving literal and full effect to such clauses; they too may be waived ... We think the proper approach, and one which is in accord with our cases, is to look at the question of waiver as a question of fact in light of all the circumstances, including the existence of the antiwaiver clause”).
Here, it is undisputed that MeadWestvaco paid all fees charged, including management fees explicitly identified as such, for seven years. It protested the management fee once, in 2002 for the year 2001, but when its protest did not succeed, it dropped the issue. Although it did not agree to sign an amendment explicitly authorizing management fees, it paid the charges for that year, and then continued to pay the charges, without further objection. Having followed that course for seven years, MeadWestvaco now, in the context of a dispute that has arisen over an entirely separate issue, seeks to make an abrupt about face, contending that the lease does not allow management fees, and that it is entitled to a refund of all such fees charged over the full seven year period. In the Court’s view, to allow MeadWestvaco to take that course in these circumstances would effect an injustice.
Although neither side contends that the lease is ambiguous, the language is less than explicit. It makes no mention of management fees, but does authorize charges for common area maintenance, setting forth a list of items that are “included” in that broad category. It does not say “including but not limited to” those items, which would clearly signal that other items might be included as well, but it also does not explicitly identify the list as exhaustive, as the landlord’s subsequent leases do. The parties’ memo-randa reveal the absence of Massachusetts cases construing similar language as to this issue.[13]
The contract language, even if not ambiguous in a legal sense, at least gave rise to an issue worthy of debate. MeadWestvaco initiated that debate in 2002, at a time when those who had actually participated in the lease negotiation might still have remembered whatever discussions might have occurred on the issue, or whatever understandings they may have had in light of norms in the industry. Upon being told that the issue had been discussed, and that the landlord’s position was in accord with such norms, MeadWestvaco retreated, and remained silent thereafter.[14] That conduct, the Court concludes, constituted a waiver with respect to the issue of management fees, and the landlord is entitled to judgment as a matter of law on count III insofar as it is based on management fees.
The question of waiver comes out differently, in the Court’s view, with respect to the dispute over other expenses. MeadWestvaco offers evidence that various items were included in reconciliation statements in such a manner that it did not recognize them as erroneous until it examined them in the course of discovery in this case. That evidence, and the inferences to be drawn from it, is contested, to be sure, but for purposes of summary judgment the Court accepts it as accurate. As the landlord points out, MeadWestvaco could have examined the underlying documentation each year; had it exercised that right, it might have found the charges it now disputes, just as it found matters to dispute on the one occasion when it did exercise that right. But the right to examine the underlying records was just that, a right, not an obligation; the failure to exercise the right cannot be deemed a waiver of MeadWestvaco’s claim for illegitimate charges that were unknown to it at the time. MeadWestvaco may, or may not, be able to prove those charges at trial, but it is entitled to an opportunity to try. Count three will stand for trial insofar as it is based on charges for operating expenses other than management fees.
The Court reaches the same conclusion with respect to the fraud claim, count four, and the c. 93A claim, count five, based on alleged fraud. To recover on a claim of fraud, the plaintiff must prove (1) that the defendant *371 made a material misrepresentation of fact with the goal of inducing the action taken by the plaintiff; (2) that the defendant knew the representation made was false, or through a minor amount of diligence could have discovered its falsity; (3) the plaintiffs justifiable reliance on the misrepresentation; and (4) that the plaintiff suffered damages as a consequence of its reliance on the misrepresentation. See Hogan v. Riemer, 35 Mass.App.Ct. 360, 365 (1993); Zimmerman v. Kent, 31 Mass.App.Ct. 72, 77-78 (1991); see also Powell v. Rasmussen, 355 Mass. 117, 119 (1969).
The element the landlord questions at this stage, in light of the summary judgment standard, is the reasonableness of MeadWestvaco’s reliance on the reconciliation statements, given its failure to exercise its right to examine the underlying documentation. Although MeadWestvaco could have learned the truth by exercising its right to examine the underlying documentation, the Court cannot conclude, as a matter of law, that its reliance on the reconciliation statements was unreasonable. See Yorke v. Taylor, 332 Mass. 368, 373 (1955) (although plaintiff had access to public records revealing assessed value of property purchased from defendant, “where a defendant has willfully made false representations with intent to deceive he ought not to be relieved of liability because of his victim’s lack of diligence...”). On the evidence presented, the issue of reasonableness is one of fact for trial. Accordingly, counts four and five will stand for trial with respect to the claim of improper charges other than management fees.
3. The Landlord’s Counterclaims
The landlord argues that it is entitled to summary judgment on the first count of its counterclaim, alleging breach by MeadWestvaco of its obligation to pay rent for the remaining term of the lease. The Landlord’s contention is that, regardless of whether it may have breached its own obligation to maintain the roof, MeadWestvaco had no right to terminate the lease. MeadWestvaco responds that, aside from its right to terminate, the landlord cannot recover without proving it performed its own obligations. The landlord cannot do so, MeadWestvaco argues; on that ground, MeadWestvaco contends that it, not the landlord, is entitled to summary judgment on this count.
To recover on its counterclaim for breach of the lease, the landlord must prove “at least substantial performance of the contract on its part.” Previews, Inc. v. Everets, 326 Mass. 333, 335 (1950). See also Bennett v. KupferBros. Co., 213 Mass. 218, 221 (1913) (in an action for breach of contract, “plaintiff was required to show substantial performance on his part. ..”). The Court has reviewed the voluminous evidence offered by the parties regarding the condition of the roof at various times during MeadWestvaco’s tenancy, and the efforts made by the landlord to maintain it. The Court concludes that neither side has established the absence of a genuine dispute of material fact on this issue; to the contraiy, the evidence would support conflicting inferences as to the timing, nature, severity, and consequences of roof leaks, what was actually and reasonably necessary to repair the leaks, and what the landlord did at various times to make repairs. The Court cannot resolve these disputes on summary judgment.
The landlord’s claim for breach of the lease presents a second, purely legal issue that the Court can resolve at this stage. The landlord argues that, regardless of its own performance, the tenant had no right under the lease to terminate. MeadWestvaco contends that it had that right as a matter of law, based on Wesson v. Leone Enterprises, Inc., 437 Mass. 708, 715-21 (2002). That decision, issued two years after the parties executed this lease, arose from facts, as found by the trial judge after a juiy-waived trial, remarkably similar to MeadWestvaco’s version of the facts here. The tenant was a printing company. Three years into a five-year lease, the tenant complained of “significant leaks in the roof,” adversely affecting its operations. The landlord made efforts at repair, but leaks recurred. The tenant terminated the lease and vacated the premises, and the landlord sued for the unpaid rent for the remainder of the lease term. Id. at 710-12.
The Supreme Judicial Court abandoned the previous common-law rule of independent covenants in commercial leases, and adopted the rule of dependent covenants set forth in the Restatement (Second) of Property (Landlord and Tenant), §7.1 (1977). Id. at 720. Under that rule, as adopted by the Supreme Judicial Court, “Except to the extent the parties to a lease validly agree otherwise, if the landlord fails to perform a valid promise contained in the lease ... and as a consequence thereof, the tenant is deprived of a significant inducement to the making of the lease, and if the landlord does not perform his promise within a reasonable period of time after being requested to do so, the tenant may . . . terminate the lease.” Wesson, 437 Mass. at 720, quoting Restatement (Second) of Property (Landlord and Tenant), §7.1 (1977), at 247.[15] A promise that constitutes a “significant inducement to the contract,” the Court explained, includes “promises that constitute a substantial benefit understood at the time the lease was entered to be significant to the purpose thereof.” Wesson, 437 Mass. at 722, citing Richard Barton Enters., Inc. v. Tsern, 928 P.2d 368, 378 (Utah 1996). On the facts as found in Wesson, the Court concluded, “a diy space necessary to safely conduct the high technology printing business for which the landlord knew the premises were to be used” qualified as a substantial benefit sufficient to constitute a significant inducement to the contract. Id. at 722. See also In re Tiny’s Cafe, Inc., 322 B.R. 224, 227-28 (Bankr.D.Mass. 2005) (even where lease expressly provided that landlord’s failure to maintain roof “shall not be grounds for the tenant to stop paying rent,” tenant was entitled to withhold rent where condition of roof interfered with tenant’s business). Massachusetts cases subsequent to Wesson have acknowledged the adoption *372 of the mutually dependent covenants rule in this state. See Shawmut-Canton LLC v. Great Spring Waters of Am., Inc., 62 Mass.App.Ct. 330, 338-39 (2004); Fafard v. Lincoln Pharmacy of Milford, 439 Mass. 512, 516 (2003).
As Wesson explicitly acknowledged in quoting the Restatement, parties to a lease may validly agree that termination by the tenant not be available as a remedy for a breach by the landlord. Here, the lease does not address the issue expressly; the lease is silent as to the tenant’s remedy for any default by the landlord. The landlord nevertheless argues that the parties agreed that the tenant would not have the remedy of termination. It bases that argument on two theories.
First, the landlord points to other provisions of the lease that do provide for termination, particularly the provisions that authorize the landlord to terminate upon default by the tenant or in case of sublease of more than fifty percent of the premises, and the provisions that authorize either party to terminate in case of fire or other casualty or eminent domain taking. These provisions authorizing termination in certain instances, the landlord argues, imply that the parties did not intend to authorize termination except in those instances.
The landlord cites Zielinski v. Connecticut Valley Sanitary Waste Disposal Inc., 70 Mass.App.Ct. 326 (2007). That case involved a lease for the site of a landfill. The lease required the tenant to operate the landfill “in strict compliance” with all applicable laws, and to indemnify the landlord for “all claims for damages, on account of injury or damage by way of any act or omission” by the tenant. Id. at 332. The lease gave the landlord the right to terminate for failure to pay rent, but did not express such a right with respect to operation in compliance with laws. On the landlord’s action for eviction based on alleged non-compliance with applicable laws, the Court held that the landlord’s remedy was limited to indemnification, and did not include termination, because the lease expressly provided for indemnification as a remedy for the type of breach alleged, and did not provide for termination, as it did for another form of breach by the tenant. The variation in the types of remedy provided to the same party for different types of breach, the Court concluded, reflected the intent of the parties. Id. at 334.
This Court is not persuaded by the landlord’s reliance on Zielinski. The provision in issue there expressly provided for a particular remedy for the aggrieved party for one type of default affecting that party, and provided a different remedy for the same party for a different default affecting that party. That is not the situation here. This lease is silent as to the tenant’s remedies for breaches of any type by the landlord; it simply does not address the question. The lease does provide for termination by the landlord for breaches by the tenant, and provides reciprocal termination rights for certain events, but it does not present varying remedies for one party in a manner comparable to the lease in Zielinski Under the language of the Restatement, as quoted in Wesson, a departure from the rule of dependent covenants requires actual agreement of the parties, not mere silence. This lease does not express such agreement, as the one in Zielinski did.
The landlord’s second theory rests on certain communications during the negotiation of the lease. The landlord offers evidence that, during the course of negotiation, a representative of MeadWestvaco’s predecessor proposed to insert, in article 14.2 regarding defaults by the landlord, a provision that “Westvaco may terminate the lease in the event the landlord defaults and fails to cure such default within 30 days after notice by Westvaco.” Counsel for the landlord rejected that proposal, saying that, “This would make the lease unfinanceable with our lenders and has never been given in any of Landlord’s leases.”[16] The landlord argues that this exchange, prior to execution of the lease, and the fact that the parties executed the lease without the insertion the tenant had proposed, reflects agreement of the parties that the tenant would have no right of termination for the landlord’s default.
The Court is not persuaded. The result of the parties’ negotiation on the subject was not the insertion of language excluding a remedy of termination for the tenant, but simply silence. The effect of silence in a contract, in the absence of a statutory rule, is that the common law fills the gap. The common law at the time the lease was negotiated was in flux: Massachusetts cases up to that rime had recognized only independent covenants in the commercial context, but the Restatement had adopted the rule of dependent covenants, and at least one appellate decision had expressed “great doubt” as to whether Massachusetts would continue to apply the rule of independent covenants. Holmes Realty Trust v. Granite City Storage Co., 25 Mass.App.Ct. 272, 277 (1988), cited in Wesson, 437 Mass, at 720 n.24. Wesson resolved the doubt in favor of the Restatement rule of dependent covenants, and applied that rule to the case before it, involving a lease negotiated, like this one, in the context of Massachusetts law in its previously uncertain state.
The Court concludes that Wesson governs this case, and that MeadWestvaco had the right to terminate the lease if the landlord failed to perform its obligation to maintain the roof within a reasonable time after being requested to do so, and as a consequence, MeadW-estvaco was deprived of a significant inducement to the making of the lease. The record leaves no genuine dispute that a weather-tight roof was a significant inducement to the making of the lease. The terms of the lease make that clear, in that repair or replacement of the roof, and subsequent maintenance of it, was specifically required, a term that is hardly surprising in light of the nature of MeastWestvaco’s business. However, whether MeadWestvaco was actually deprived of that benefit to a significant extent cannot be resolved based on the present record; as discussed supra the evidence offered supports conflicting infer- *373 enees as to the extent of the problems with the roof, the frequency and timing of MeadWestvaco’s complaints about it, and the nature and timing of the landlord’s efforts to address the problem. Accordingly, summary judgment cannot be entered on the landlord’s claim of breach of contract based on failure to pay rent (count one). The landlord’s claim of breach of the implied covenant (count three) depends on the same disputed facts, and must also stand for trial.
The landlord’s claim for declaratory judgment (count two) seeks a declaration that the lease has not been effectively terminated. The purpose of the claim, apparently, was to obtain a legal ruling as to whether the tenant had the right to terminate. The Court has provided the legal ruling sought, but cannot at this stage apply that ruling, because the facts remain to be determined at trial. MeadWestvaco argues that the declaratory judgment count should be dismissed, because the breach of contract counts will resolve all issues between the parties, so that no actual controversy will remain. The Court is inclined to agree, but sees no purpose to be served by dismissing the declaratory judgment count at this stage; once the breach of contract counts on both sides are resolved, the Court will be in a better position to determine whether any controversy remains that could properly be resolved by means of a declaration. Accordingly, both sides’ motions for summary judgment will be denied as to the landlord’s counterclaims.
4. Rand Whitney’s Motion for Summary Judgment
As recited supra, MeadWestvaco’s complaint asserts four counts against Rand Whitney. All four are designed to forestall the possibility that, if MeadW-estvaco is determined to have terminated the lease effectively, it will be held liable to the landlord for one and one-half times the rent during the period of Rand Whitney’s continued occupancy after the termination, pursuant to article 15.19 of the lease. To address that prospect, MeadWestvaco seeks damages from Rand Whitney “for any amounts MeadWestvaco is obligated to the Landlord for under the Lease as a result of Rand Whitney’s continued occupancy of the Premises after termination of the Lease and Sublease” (count six); indemnification for the same (count seven); damages for “any amounts [MeadWestvaco] is required to pay as a result of Rand Whitney’s continued use and occupancy of the Premises” (count eight); and summary process (count nine). Rand Whitney moves for summary judgment on all counts against it, arguing that MeadWestvaco has no right to possession, since it purports to have terminated its lease; that the claims for damages and for indemnification are premature, and further that they lack any common-law or contractual basis. The Court agrees with Rand Whitney on the first two points, and need not reach the third. [17]
“It is widely acknowledged, in Massachusetts and elsewhere, that a sublessee becomes a tenant at sufferance in relation to the lessor upon termination of the sublessor’s tenancy, at least absent an agreement to the contrary.” Dale v. H.B. Smith, Inc., 136 F.3d 843, 847 (1st Cir. 1998), citing Evans v. Reed, 71 Mass. 308, 209 (1855); see also Zevitas v. Adams, 276 Mass. 307, 317 (1931) (“After entiy [by the lessor] [the lessee] had no claim on [the subtenants] and from that time on the subtenants held under the lessors”).[18] This rule, applied to the circumstances presented here, means that upon MeadWestvaco’s termination of its lease, Rand Whitney became a tenant at sufferance of the landlord, not of MeadWestvaco.[19] It follows that MeadWestvaco has no right to evict Rand Whitney.
Chapter 239 of the General Laws provides for eviction by summary process. Section one provides that, under specified circumstances, “the person entitled to the land or tenements may recover possession thereof under this chapter.” See Metropolitan Credit Union v. Matthes, 46 Mass.App.Ct. 326, 330 (1999), quoting Wayne Inv. Corp. v. Abbott, 350 Mass. 775, 775 (1996) (“Right to possession must be shown”); see also Cummings v. Wajda, 325 Mass. 242, 243 (1950) (“Summary process is a purely statutory procedure and can be maintained only in the instances specifically provided form the statute”). Mead-Westvaco, by its own allegations, is not the person entitled to the building in issue here; its entitlement ceased upon its termination of its lease. The only party entitled to the building is the landlord, which has not sought to evict Rand Whitney. Rand Whitney is therefore entitled to judgment as a matter of law on count nine.
The other three counts against Rand Whitney, although cast in varying terms, all in substance claim indemnification for liability that MeadWestvaco anticipates it might incur on a claim that the landlord has threatened, but has not actually brought in this action or, as far as the record discloses, in any other. MeadW-estvaco acknowledges that, as Rand Whitney argues, its claim for such indemnification would not accrue until such time as its liability to the landlord might be established. E.g. Wolverine Ins. Co. v. Tower Iron Works, Inc., 370 F.2d 700, 702-03 (1st Cir. 1966). It argues, however, that it may nevertheless press its claims for indemnification at this time pursuant to Mass.RCiv.P. 14(a). That Rule provides that “At any time after commencement of the action a defending party may. . . cause a summons and complaint to be served upon a person who is or may be liable to him for all or part of the plaintiffs claim against him.” The plain language of the Rule makes clear that its purpose is to permit litigation of a complete set of related claims together, in one action, not to authorize a party to obtain what is in substance an advisory opinion, as MeadWestvaco seeks to do here.
Here, MeadWestvaco is “a defending party,” in that it is defending the landlord’s counterclaims. Rule 14 thus authorizes MeadWestvaco to join any party “who is or may be liable” to MeadWestvaco for any part of the landlord’s counterclaims against it. The landlord, however, has not pled any counterclaim for holdover rent. Rule 14 therefore provides no basis for joinder of Rand Whitney.
*374 MeadWestvaco’s purpose in asserting its claims against Rand Whitney is apparent: it seeks to have the Court decide the question of whether it would have liability to the landlord under Article 15.19 of the lease, based on Rand Whitney’s continued occupancy, if its termination is determined to be valid, and if, at some point in the future, the landlord were to assert such a claim.[20] The effort is understandable, but MeadW-estvaco is not entitled to call upon the Court to resolve such a hypothetical question. Rand Whitney is entitled to judgment as a matter of law on all counts against it.
CONCLUSION AND ORDER
For the reasons stated, Plaintiff MeadWestvaco’s Motion for Partial Summary Judgment is DENIED; Defendant Worcester New Bond LLC’s Motion for Summary Judgment is ALLOWED as to so much of count three of the plaintiffs complaint as relates to management fees, and otherwise DENIED; and Defendant Rand Whitney’s Motion for Summary Judgment is ALLOWED.

MeadWestvaco Corporation is the result of a 2002 merger between the Mead Corporation and the Westvaco Corporation. The original tenant was Westvaco; the new entity acquired its rights and obligations under the lease as a result of the merger. MeadWestvaco has subleased a portion of the premises to Rand Whitney, which continues to occupy it.

Worcester New Bond is the owner of the property; it transferred the lease to Liberty MA Portfolio Fee LLC, and Liberty Properties Corporation performs administrative services. The Court will refer to all three collectively as “the landlord.”

The building contains additional space leased to other tenants.

MeadWestvaco purports to dispute Rand Whitney’s assertion that it continues to pay rent, but offers no contrary evidence, saying only that it lacks knowledge on the point. No party has contended that Rand Whitney is in default of any rent obligation.

MeadWestvaco points to a report of its environmental expert opining that roof leaks had caused mold infestation. The landlord disputes the expert’s conclusions, and points out that the area in issue had been unoccupied for years.

This definition had appeared in the original “firm offer to lease” drafted by the landlord, and was unchanged in the lease as executed.

The landlord has not identified direct evidence of such discussions. It relies on a contemporaneous memorandum to it from a broker who apparently represented the landlord in the transaction, indicating that management fees would be included; the landlord apparently interprets that memorandum as a report of discussions between the broker and Westvaco. The present record does not provide a basis for the Court to determine what if any role that memorandum could play at trial in the landlord’s effort to prove agreement between the parties on the subject.

Apparently a dispute was outstanding at that time regarding some earlier claimed overdue rent, to which the landlord applied MeadWestvaco’s payment for operating expenses; as a result, the record leaves some uncertainty as to precisely what charges were or were not paid.

The present motions do not address counts four and five of the counterclaim, since they were added after the motions had been served. The Court notes that G.L.c. 231, §6F, provides a remedy to be invoked “upon motion... in any civil action in which a finding, verdict, decision, award order or judgment has been made.” It is not properly asserted as a counterclaim. See generally, Powell v. Stevens, 69 Mass.App.Ct. 87, 92 n.7 (2007); Ben v. Schultz, 47 Mass.App.Ct. 808, 814 (1999).

The landlord cites Guaranty First Trust Co. v. Textron, Inc., 416 Mass. 332 (1993). That case involved a claim under G.L.c. 21E, §5(a)(iii), which imposes strict liability for damage to property resulting from the release of hazardous materials. Id. at 334. The Court ruled in that case that “[a] party suffering property damage may also recover for loss of use,” and that lost rent is “part of the remedy for damage to real property to the extent it represents diminution in market value or loss of use.” The case hardly assists the landlord here.

Article 15.3 of the lease provides that “Failure on the part of the Landlord or Tenant to complain of any action or non-action on the part of the other, no matter how long the same may continue, shall never be a waiver by Tenant or landlord, respectively, of any of their rights hereunder.”

MeadWestvaco cites — and misconstrues — a Nebraska case, McDonald's Corp. v. Goler, 251 Neb. 934, 939-40 (1997). The Court there construed significantly different contract language to permit the landlord to pass on to the tenant charges paid to a management company, but only those charges related to management of common areas.

It may be of some significance that MeadWestvaco appears to have raised the issue shortly after its merger in 2002, when the individuals dealing with the landlord were no longer those who had negotiated the lease.

This rule is different from the rule of constructive eviction, as there is no requirement for the leased premises to be “untenable” for the purposes contemplated in the lease. Wesson at 721.

MeadWestvaco urges the Court not to consider this evidence, contending that it has not been properly authenticated and that it constitutes parol evidence offered to vary or contradict the terms of the lease. For the reasons that will become clear, the Court need not address these objections.

For purposes of Rand Whitney’s motion, the Court assumes, as have both parties, that MeadWestvaco’s termination of the lease was valid and effective. The landlord has taken no position on Rand Whitney’s motion.

That does not necessarily mean that, in particular circumstances under particular lease provisions, a lessee could not have liability for holdover by a sub-lessee, for which liability the sub-lessee might be obligated to indemnify the lessee. See C. Healy Associates, Inc. v. Concord Co., Inc., 1992 Mass.App.Div. 22, 1992 WL 24068 (Mass.App.Div.) *2. Mead-Westvaco reads that decision of the Appellate Division of the District Court as applying a broad rule that a sub-tenant who remains after termination of the tenant’s lease is a tenant at sufferance of the tenant, rather than the landlord, so that the tenant may sue for possession and use and occupancy. Such a rule would be inconsistent with the appellate authorities cited supra, as well as with the summary process statute, and this Court would not follow it.

Indeed, it may have become a tenant at will of the landlord. See Evans v. Reed, 71 Mass. 308, 309 (1855), quoted in Dale v. Smith, 136 F.3d at 847 (“Had [the sublessee] remained after [the sublessor] left, and [the owner] accepted rent of him, it would have been evidence from which an agreement to accept [the sublessee] as a tenant might have been implied”).

There is room for considerable doubt whether the landlord could bring such a claim, not having done so to date. See Mass.R.Civ.P. 13(a).